HARRY H. KELLOGG v. SCHOOL DISTRICT No. 10 OF COMANCHE COUNTY, OKLAHOMA TERRITORY.

(Filed September 10, 1903.)

1. MUNICIPAL DEBT—Who May Sue to Prevent. A resident taxpayer although he shows no special private interest, may invoke the interposition of a court of equity to prevent an illegal disposition of the money of the municipality, or the illegal creation of a debt which he in common with other property owners may otherwise be compelled to pay.

2. INJUNCTION—Proper Remedy, When. Injunction at the suit of a taxpayer is the proper remedy to restrain a school district from contracting for or constructing school houses at unauthorized places, and contracting liabilities therefor which the district would be liable for and the taxpayers required to pay.

3. SCHOOL DISTRICT—Authority. A country school district, not embracing a city of the first class, a union graded school or sepa-

rate school for colored pupils, has no authority to construct more than one school house in the district, and can only maintain one school at the public expense.

4. SCHOOL—Where Located. A country school district is prohibited from selecting a building site for a school house more than one half mile from the center of the district, and the school board is required when they do build, to construct a house on such site.

.5. SCHOOL DISTRICTS—Remedy in Regard to. If a school district is too large, relief must be had by application to the county superintendent for the creation of new school districts.

6. PATENT ERROR—Effect of. Where error is apparent upon the face of the judgment roll or record proper, no motion for new trial is necessary in order to have the judgment reviewed.

7. SAME. Where there is manifest error on the judgment roll or record proper, the judgment may to attacked for the first time in the supreme court by a proper assignment in the petition in error.

8. SCHOOL DISTRICT—Duties of Officers. The officers of a school district have no power to borrow money, except by issuing bonds and selling the same in the manner provided by statute, and the officers cannot circumvent the statute by issuing warrants and selling them and investing the proceeds. A warrant is only authorized to be issued in payment of a valid, existing obligation of the school district, previously created or imposed.

9. SAME—Warrants. A school district warrant is not negotiable paper and the purchaser or holder is not an innocent purchaser, but takes such warrant with notice of, and subject to, all defects and irregularities in its issuance.

10. SAME—Action to Prevent Payment of Warrants—Parties. A taxpayer may maintain an action to restrain the payment of an illegal warrant of the district, without making the holder of the warrant a party to such action.

(Syllabus by the Court.)

*Error from the District Court of Comanche County; before Frank E. Gillette, Trial Judge.*

*C. W. Starling* and *Frank McMaster,* for plaintiff in error.

*Cunningham & Hudson* and *J. A. Baker,* for defendant in error.

Opinion of the court by

BURFORD, C. J.: The plaintiff in error, Harry H. Kel-

logg, brought this action in the district court of Comanche county to enjoin the defendant in error, School District No. 10 of Comanche county, from erecting four school houses in said district, and from creating a debt against said school district for the construction of said buildings. He alleges in his petition that he is a resident of, and taxpayer in, said district; that said school district was organized at a meeting of the electors of said district and a site for a school house selected within one-half mile of the center of said district, and that said site had been donated to the school district by the owner; that afterwards the school district abandoned said site and determined to construct four school houses in said district, none of which are in one-half mile of the center of the district. That in order to procure the means for constructing said buildings, the school board for said district issued a warrant upon the treasury of said district for the sum of fifteen hundred dollars, and exchanged said warrant for lumber of the value and amount of twelve hundred dollars, and were proceeding to use said lumber in the construction of four several school houses in the four quarters of said school district. He further alleges that said warrant in amount exceeds four per cent. of the assessed valuation of the taxable property in said school district, and he prays that the school district and its officers be restrained from erecting more than one school house, and from erecting any school house more than a half mile from the center of said district, and that they be further restrained from paying said warrant.

To this petition the school district answered, admitting that the site near the center of the district had been

secured by the school district, and that it was not the purpose of the board to build upon said site at this time. That the electors of said district had decided to construct four school houses, and conduct four separate schools at four different places in said district, and that the school district and its officers were proceeding to carry out said plan, and had located four several sites, none of which were within one-half mile of the center of said district, and had issued a warrant for fifteen hundred dollars, and sold the same for twelve hundred dollars, and had contracted for twelve hundred dollars' worth of building material, to be delivered at the four sites selected by the school district.

The issues were closed by a reply, and the case submitted to the court upon the pleadings and oral testimony. The district court rendered judgment for the defendants in error, and dismissed plaintiff's action. Kellogg appeals and the case is here for review.

It is contended by counsel for defendant in error that there is no sufficient assignment of error to present any question for the consideration of this court. This contention is not without some merit. In the trial court the plaintiff in error filed his motion for new trial, on which his only ground assigned was: "Errors of law occurring at the trial, and duly excepted to by the plaintiff." This is the eighth cause for new trial, as embraced in the code (Wilson's Stat., sec. 4493), and will present to the trial court any objection or exception properly saved during the progress of the trial. (*Boyd v. Bryan*, 11 Okla. 56; 65 Pac. 940.) And an assignment of error in this court to the effect that the trial court erred in overruling the motion for a new trial, will bring before this court for review every excep-

tion saved by the complaining party during the progress of the trial. But the errors complained of in this case do not belong to that class embraced in the term "occurring at the trial." This specification embraces every ruling and decision of the trial court upon the trial of the cause, from the time the trial begins until the cause is submitted to the jury for its verdict, or the court for its decision. But it does not include an erroneous verdict by the jury, or decision by the court upon the facts. The sixth cause for new trial is "That the verdict, report or decision is not sustained by sufficient evidence, or is contrary to law." This cause was not set out in the motion for new trial, but the contention of the plaintiff in error is, in this court, that the judgment of the court is contrary to law upon the pleadings and undisputed facts.

The contention of counsel for defendant in error is correct, that the motion for new trial does not present the objections urged by counsel for plaintiff in error in his brief. However, it does not necessarily follow that there is nothing presented by the record that this court can consider. There are some errors that may be presented for the first time in this court. It is a general rule that the appellate court will not review any alleged errors which were not presented to the trial court for its reconsideration, yet there are some exceptions to this rule. When the error is apparent upon the face of the judgment roll, or as we say in more modern language, upon the face of the record proper, then such error will be considered by the appellate court, although not presented to the trial court in the motion for new trial. (*Territory ex rel. Taylor v. Caffrey*, 8 Okla. 193; 57 Pac. 204; *Caffrey v. Overholser*, 8 Okla. 202; 57 Pac. 206.)

19—Vol 13

In this case the record proper or judgment roll consists of the petition, answer, reply, orders of the court and final judgment.

The fourth assignment in the petition in error is: "Said court erred in not rendering judgment for the plaintiff in error upon the pleadings and undisputed testimony." This assignment sufficiently presents to this court any error apparent upon the face of the judgment roll. While we cannot go into the testimony under any assignment of error contained in the record, yet if the judgment is contrary to law, as appears from the facts alleged and admitted in the pleadings, then this court is required to reverse such judgment. (*Territory ex rel. Taylor v. Caffrey, supra.*) It appears from the undisputed facts contained in the pleadings that the school district and its officers are proceeding to erect four separate and several school houses upon four several and separate sites in the same school district, and to conduct and maintain four several and separate schools in said district, from the common funds of said school district, and that none of said sites are within one-half mile of the center of said district; also that the school board is expending the funds of the district for said four several school houses, and that they have issued a warrant for fifteen hundred dollars against the funds of said district, and traded it for material to erect four school houses. It further appears that this is a country school district, and there is no allegation or contention that any of said school houses are for colored pupils. These facts being conceded, the trial court denied an injunction. This appears upon the face of the record. If there is no power or authority vested in an urban school district

to erect more than one school house for white children, and no authority given to conduct more than one white school in a school district, and no authority given to erect a school house on a site more than a half mile from the center of the school district, then, or in either such case, the school board is acting without authority, is misappropriating the funds of the district, and the judgment of the court is contrary to law.

Before determining these questions presented by the record, a preliminary question is presented by counsel in their briefs, and one which we are advised in the argument was controlling with the trial court. It is contended that the plaintiff in error, as a taxpayer and inhabitant of the school district, and one having children to send to said schools, has not shown such an interest in the subject-matter as will entitle him to maintain this cause. There is nothing in the record to show that this objection was ever made in the trial court, nor is there any cross-petition in error in this court. The defendant in error did not demur to the petition, nor did it object to the introduction of testimony at the trial. As the only grounds of objection is that the petition does not state facts sufficient to constitute a cause of action in favor of the plaintiff, and no such objection was presented either by demurrer, motion or objection in the trial court, the question is waived, and cannot be presented in this court by argument in a brief. If presented in this court as an original objection, it can only be presented by cross-petition in error, and this has been waived. But inasmuch as both parties have argued the question in their briefs, and the question will arise upon a new trial, we deem it proper to now determine

the question to the end that the case will not have to be appealed a second time to settle this question.

It seems to have been generally accepted that the supreme court of Oklahoma has adopted the rule enunciated by the Kansas supreme court, and held that a taxpayer of a municipal corporation who shows no special or different interest in the subject-matter of the controversy than that which he shares in common with all others similarly situated, cannot maintain an action to restrain or prevent the consummation of unauthorized acts by the corporation or its officers, and this inference is based upon the case of *Stiles, Treas., v. City of Guthrie,* 3 Okla. 26. A critical examination will disclose that the Stiles case does not decide this question. It is true that in the discussion of the questions involved in that case, Mr. Justice Bierer mentions and quotes from the Kansas cases which support this doctrine, but this was only by way of argument, and there is nothing in the Stiles case that calls for a decision on the law here under discussion. In that case the city of Guthrie and two or three taxpayers of Logan county, brought suit against the county treasurer and the county commissioners to enjoin the collection of the road and bridge tax for the year 1893. These plaintiffs secured an injunction against the county officers, and in favor of all the taxpayers in the county. The supreme court held that the plaintiffs could not secure an injunction in favor of par-ties who had not joined in the action. This question is regulated by statute, and the court was construing the statutory provisions relating to the restraining of the collection of taxes illegally assessed. An examination of the Oklahoma cases will reveal the fact that this court has never enunciated any rule on this subject, and the question is an open one,

and we are free to adopt that rule which is supported by the greatest weight of authority and has the soundest reasoning for its basis.

Again it is suggested that we adopted our civil code from Kansas, and that the rule contended for as the Kansas rule is one of the construction of a statute, and that we adopted this construction and are bound by it. We admit that if the rule enunciated and adhered to so vigorously by the Kansas supreme court is one of the construction of a provision in our code of civil procedure, then we should follow it. But we think the advocates of the Kansas doctrine are in error in the contention that the rule is the result of statutory interpretation.

The doctrine was first announced by that court in the case of *Graft v. Jackson Co. Commissioners*, 5 Kan. 518, which was an action by an inhabitant and taxpayer to restrain the county commissioners from issuing two county warrants, on the alleged grounds that the claims were illegal. No mention is made of any statutory provision. Mr. Chief Justice Kingman delivered the opinion of the court, and states the doctrine thus:

"It is well known that the general rule is, that for wrongs against the public, whether actually committed or only apprehended, the remedy, whether civil or criminal, is by a prosecution instituted by the state in its political character, or by some officer authorized by law to act in its behalf, or by some of those local agencies created by the state for the management of such of the local affairs of the community as may be entrusted to them by law. The individual citizen does not in his own name interefere in behalf of the interests of society, but society acts through and ,by its prop-

erly constituted agencies. The law as a general principle has not deemed it proper that offenses or grievances of a public character should be investigated at the suit of a private individual, nor that the officers to whom important trusts have been confided, should be held liable for their acts to any one. When those acts effect every one alike, such officers are as amenable as private citizens for any abuse of their authority. If the injury is one that peculiarly affects a person, he has his right of action; if it affects the whole community alike, their remedy is by proceedings by the state through its appointed agencies."

In support of this doctrine the learned judge cited the following cases: *Bigelow v. The Hartford Bridge Co.,* 14 Conn. 566; *O'Brien v. Norwich and Worcester R. R. Co.,* 17 Conn. 372; *Falls Village W. P. Co. v. Tibbetts,* 31 Conn. 165; *Doolittle v. Supervisors of Broome Co.,* 18 N. Y. 157; *Rooseveltd v. Draper,* 23 N. Y. 319; *Smith v. City of Boston,* 7 Cush. 254.

Kansas has consistently and continuously followed this rule, and the case of *Nixon v. School Dist. No. 92, McPherson County,* is identical with the case under consideration, and the court followed *Craft v. Commissioners of Jackson County,* and held that the plaintiff, a taxpayer and inhabitant, had no such special interest as would entitle him to an order restraining the erection of a school house at an illegal site. But in no case decided by the supreme court of Kansas have they attempted to base this doctrine upon any statutory provision. The learned justice who wrote the opinion in *Craft v. Jackson County* was unfortunate in his citation of the Connecticut cases to support his position. The cases cited, 12, 17 and 31 Connecticut, each hold that a private individual may not have an injunction to restrain a

public nuisance, unless he is affected differently from the general public; that the abatement of public nuisances belong to the public, and should be conducted by the public prosecutors. But in the case of *The City of New London v. Brainard et al.*, 22 Conn. 552, which was a bill in equity by Brainard and others as inhabitants and taxpayers of the city, for an injunction to restrain the city and city treasurer from paying an appropriation of fifteen hundred dollars which had been voted by the city for the celebration of the Fourth of July, the supreme court held that the appropriation was illegal, that injunction was the appropriate remedy, and that the plaintiffs as taxpayers and inhabitants of the city were entitled to the remedy, to prevent a misappropriation of the funds in the city treasury.

In *Scofield v. Eighth School District*, 27 Conn. 499, the court held that a taxpayer and inhabitant of a school district was entitled to an injunction restraining the district from allowing the school house to be used for improper purposes.

In *Mooney v. Clark*, 37 Atl. 506, the supreme court of Connecticut held that a taxpayer could enjoin the city from entering into an unauthorized contract. Hence it will be observed that the Connecticut cases do not support the Kansas doctrine in the class of cases presented by the record in this case.

The New York courts adhered to the rule stated in the Kansas cases until 1872, when the legislature remedied the evil resulting from the rule, and passed a law authorizing a taxpayer to prosecute actions to prevent the wrongful acts of municipal officers and agents. Under this statute taxpay-

ers have been permitted to bring and maintain suits at law or in equity for the prevention of wrongs by municipal officers and agents. In the first cases reported from the supreme court of New York after the enactment of this statute, in *Ayers et al. v. Lawrence et al.*, 59 N. Y. 192, Mr. Justice Allen, speaking for the court, said:

"The circumstances under which the law was enacted, the mischiefs it was designed to remedy, and its general purpose and object are well understood, and so far as these circumstances can legitimately aid in its interpretation, they should be taken into consideration. Municipal corporations had become to an alarming extent the prey of the spoiler, and the taxpayer, upon whom the loss fell and the burden of the wrongdoing ultimately rested, was remediless. The wrong was ordinarily accomplished not by a waste or destruction of the property or funds of the corporation in actual possession, but by the issue and sale of the bonds or other obligations of the municipality, and a conversion or misappropriation of the proceeds. It was by abuse or misuse of the credit of the corporation, creating a lien upon its property, if it had any, but especially pledging its future resources, and the power of taxation vested in the municipal government, that the funds and property of the corporation were wasted, and the taxpayer burdened, and his property encumbered. By the rules of law, as established by the courts, the taxpayers were entirely without remedy, no matter how gross the fraud or wanton the robbery, and notwithstanding the officers of the corporation, those whom the law had put in authority to watch over and protect their constituents and guard their interests, were faithless to their duty or confederates with the wrongdoers. Neither was there authority in the state by its attorney general to intervene by action to protect the property rights and interests of municipal corporations. This utter helplessness of the taxpayer, and the fact that he was entirely at the mercy of officials who might prove un-

worthy of and criminally unfaithful to their trust, became an evil calling loudly for correction. Frauds had been accomplished and municipalities wasted and burdened without redress, and the act was passed with a view to remedy the felt defect in the law, and give the taxpayer a concurrent action with the corporation for the prevention or correction of the wrongs mentioned in it."

This act was subsequently liberally construed so as to embrace every kind of action, legal or equitable, that might be necessary to enable taxpayers to prevent unauthorized appropriation of moneys and illegal assessments and levies of taxes. So it will be observed that both the states relied upon by the Kansas court as authority for its doctrine have repudiated their former position, one by its courts, and the other by its legislature.

Upon the other hand, the doctrine that an inhabitant and taxpayer of a municipal corporation may maintain a suit by injunction to prevent the misappropriation of the funds of the corporation, the creation of invalid debts, the levy of unauthorized taxes, and the perpetration of official wrongs, has met the approval of such eminent and distinguished jurists as Field, Dillon, Cooley, Elliott, Campbell, Sharswood and others, and the courts of highest resort in the United States, and in practically all the states of the Union. In the case of *Crampton v. Zabriska,* 101 U. S. 601, Mr. Justice Field, speaking for the court, said:

"Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county, or illegal creation of a debt which they in common with other property holders of the county may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the state

courts in numerous cases, and from the nature of the powers exercised by municipal corporations, the great danger of their abuse and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong, when the officers of those corporations assume in excess of their powers to create burdens upon property holders. Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained to prevent the misuse of corporate powers. The courts may be safely trusted to prevent the abuse of their process in such cases. Those who desire to consult the leading authorities on this subject, will find them stated or referred to in Mr. Dillon's excellent treatise on the law of Municipal Corporations."

On this subject Mr. Dillon says, vol. 2, sec. 914:

"In this country the right of property holders or taxable inhabitants to resort to equity to restrain municipal corporations and their officers from transcending their lawful powers or violating their legal duties in any mode which will injuriously affect the taxpayers—such as making an unauthorized appropriation of the corporate funds, or an illegal or wrongful disposition of the corporate property, or levying and collecting void and illegal taxes and assessments upon real property under circumstances presently to be explained—has, without the aid of statute provision to that effect, been affirmed or recognized in numerous cases in many of the states. It is the prevailing—we may now add, almost universal—doctrine on this subject. It can, we think, be vindicated upon principle, in view of the nature of the powers exercised by municipal corporations and the necessity of affording easy, direct and adequate preventive relief against

their misuse. It is better that those immediately affected by corporate abuses should be armed with the power to interfere directly in their own names, than to compel them to rely upon the action of a distant state officer. The equity jurisdiction may in such cases usually rest upon fraud, breach of trust, multiplicity of suits, or the inadequacy of the ordinary remedies at law."

Sec. 915: "The doctrine of the preceding section is also supported by an analogy supplied by a settled rule of equity applicable to private corporations. In these the ultimate *cestuis que* trust are the stockholders. In municipal corporations the *cestuis que* trust are in a substantial sense the inhabitants embraced within their limits. In each case the corporation or its governing body is a trustee. If the governing body of a private corporation is acting *ultra vires* or fraudulently, the corporation is ordinarily the proper party to prevent or redress the wrong by appropriate action or suit in the name of the corporation. But if the directors will not bring such an action, our jurisprudence is not so defective as to leave creditors or shareholders remediless, and either creditors or shareholders may institute the necessary suits to protect their respective rights, making the corporation and the directors defendants. This is a necessary and wholesome doctrine. Why should a different rule apply to a municipal corporation? If the property or funds of such a corporation be illegally or wrongfully interfered with, or its powers be misused, ordinarily the action to prevent or redress the wrong should be brought by and in the name of the corporation. But if the officers of the corporation are parties to the wrong, or if they will not discharge their duty, why may not any inhabitant and particularly any taxable inhabitant, be allowed to maintain in behalf of all similarly situated, a class suit to prevent or avoid the illegal or wrongful act? Such a right is especially necessary in the case of municipal and public corporations, and if it be denied to exist, they are liable to be plundered, and the taxpayers and property

owners on whom the loss will eventually fall are without effectual remedy."

After some further discussion of the subject, Judge Dillon declares: " *   *   *· that the following conclusions rest upon sound reason, and have also the support of the decided preponderance of judicial authority:

"1. The proper parties may resort to equity, and equity will in the absence of restrictive legislation, entertain jurisdiction of their suit against municipal corporations and their officers when these are acting *ultra vires* or assuming to exercise a power over the property of the citizens or over corporate property or funds which the law does not confer upon them and where such acts affect injuriously the property owner or the taxable inhabitant. But if in these cases the property owners or the taxable inhabitants can have full and edequate remedy at law, equity will not enterfere, but leave them to their legal remedy.

"2. That in the absence of special controlling legislative provision, the proper public officer of the commonwealth which created the corporation and prescribed and limited its powers, may in his own name or in the name of the state, on behalf of residents and voters of the municipality, exercise the authority in proper cases, of filing an information or bill in equity to prevent the misuse of corporate powers or to set aside or correct illegal corporate acts.

"3. That the existence of such a power in the state or its proper law officer, is not inconsistent with the right of any taxable inhabitant to bring a bill to prevent the corporate authorities from transcending their lawful powers where the effect will be to impose upon him an unlawful tax or to increase his burden of taxation. Much more clearly may this be done when the right of the public officer of the state to interfere is not admitted or does not exist, and in such case, it would seem that a bill might properly be

brought in the name of one or more of the taxable inhabitants for themselves and all others similarly situated, and that the court should then regard it in the nature of a public proceeding to test the validity of the corporate acts sought to be impeached, and deal with and control it accordingly."

Judge Cooley, in his work on Taxation, 2d ed., p. 764, in discussing the question now under consideration, says:

"When a municipality or its officers take or threaten to take action in the creation of a debt or in the incurring of obligations which if allowed to go on must eventually result in taxation, the only effectual remedy may be in enjoining such action *in limine*. As the action, if illegal, would constitute usurpation of authority, the state through its law officer has undoubted right to interfere by bill. But this is not always a satisfactory remedy, because the public authorities might be indisposed to resort to it or to pursue it with sufficient vigor to render it effectual. The more common remedy, therefore, is for taxpayers to file bills on their own behalf. The right to do this has been seriously contested in some cases, it being insisted that until a tax is actually laid, the grievance, if any, is purely a public grievance, and public grievances must be redressed on the application of the proper public authorities. It is urged that individuals can proceed in equity only when their interests are separate and individual, and such interests are only affected by the unlawful action when a tax is laid and has become an individual charge against the several persons taxed. On the other hand, it is said that the case is to be distinguished from the cases of purely public wrongs in which the general public are alike concerned, that the taxpayers constitute a class specially damaged by the unlawful act, in the increase of the burden of taxation upon their property. They have, therefore, a special interest in the subject-matter of the suit, distinct from that of the general public, and the jurisdiction of equity may be sustained on the ground that the injury which

would be done by the unlawful municipal action would be irreparable. This would meet any objection on the ground that the parties would have a remedy at law when the tax came to be levied. There is great force in this view. In many cases the injury that would result from the enforcement of an illegal tax would be irreparable, because the tax moneys when collected are under control of the public authorities, and if made use of by them, though under circumstances amounting to misappropriation, are effectually lost to the taxpayers, since if they sue to recover what they have paid, they will inevitably be taxed again to make up the deficiency which the repayment to them must cause. It is well settled that a misappropriation of public moneys whereby a deficiency in its revenues is caused, will not render a subsequent tax illegal, even though it is levied for the very purpose of supplying the deficiency thus illegally caused; and the importance of an interference *in limine* is therefore manifest.

"Some states have endeavored to prevent misappropriations by providing in their constitutions that a tax shall be applied only to the object designated by the law in pursuance of which it is·laid, but while such a provision is obligatory upon the officers, it is one easy of evasion by men upon whom the sense of public duty rests but lightly. The occasions for interference to prevent misappropriations are therefore not uncommon, and the courts have interfered on the application of taxpayers not only where a tax legally laid and collected was about to be misapplied, but also where the tax was collected for an illegal purpose, so that, if the moneys were applied to that purpose, the application would in a legal sense be a misappropriation.

"The reasons for preventive remedies are very forcible when it is proposed to create a corporate debt and issue as evidence of it negotiable securities under authority of law to contract in that form, and to put such securities into cir-

culation.   The effective remedy must usually in such cases be preliminary to the threatened illegal action; and the very decided preponderance of authority is that the proper redress may be had upon the application of individual taxpayers."

New York, Ohio and Massachusetts each have statutes authorizing taxpayers to maintain suits to prevent corporate and official wrongdoing, where the result will effect the public funds already collected or increase the burdens of taxation.

In *U. P. R. R. Co. v. Lincoln Co.*, 3 Dillon 300, Judges Dillon and Dundy enjoined the county from issuing unauthorized bonds upon the suit of the railroad company as a taxpayer.

The following cases each expressly hold that a taxpayer has such an interest as to entitle him to bring an action to restrain the unauthorized expenditure of public funds, or the exercise of illegal corporate acts:   *Colorado Paving Co. v. Murphy,* 78 Fed. 28; *Davenport v. Buffington et al.,* 97 Fed. 237; Alabama: *New Orleans M. & C. R. R. Co. v. Dunn,* 51 Ala. 128; Arkansas: *Russell v. Tole et al.,* 52 Ark. 541; California: *Mock v. City of Santa Rosa,* 126 Cal. 331; Colorado: *Nelson v. Board Co. Comm'rs Garfield Co.,* 40 Pac. 474; Connecticut: *Terrett et al. v. Town of Sharon,* 34 Conn. 105; Florida: *Chamberlain v. City of Tampa,* 23 So. 572; Idaho: *Dunbar v. Board of Comm'rs of Canyon Co.,* 49 Pac. 409; Illinois: *City of Springfield v. Edwards,* 84 Ill. 626; *Colton et al. v. Hanchett et al.,* 13 Ill. 615; Indiana: *The City of Valparaiso v. Gardner,* 97 Ind. 1; Iowa: *Cornell College v. Iowa County,* 32 Iowa 520; Maryland: *Mayor & Council of Baltimore v. Gill,* 31 Md. 375; Michigan; *Curtenius et al. v. Kalamazoo Township et al.,* 37 Mich. 583; Minnesota: *Harrington v. Plainview,* 27 Minn. 224; *Sinclaim et al.*

*v. Board of Winona Co.,* 23 Minn. 404; Missouri: *Hooper v. Ely,* 46 Mo. 505; *Wagner v. Mesty et al.,* 69 Mo. 150; New Hampshire: *Merrill v. Plainfield,* 45 N. H. 126; New Mexico: *Laughlin v. Board Santa Fe Co.,* 5 Pac. 817; Nebraska: *Whitcomb v. Board of Saline Co.,* 24 Neb. 50; *Ackerman v. Thummel,* 40 Neb. 95; *Tukey v. City of Omaha,* 74 N. W. 613; Oregon: *Brownfield v. Houser et al.,* 30 Ore. 534; 49 Pac. 843; Pennsylvania: *Page et al. v. Allen et al.,* 58 Pa. St. 338; Rhode Island: *Sherman et al. v. Carr, City Treas.,* 8 R. I. 431; Texas: *Blessing v. City of Galveston,* 42 Tex. 641; *Robertson v. Breedlove,* 61 Tex. 316; Vermont: *Stevens v. R. & B. R. R. Co.,* 29 Vt. 545; Virginia: *City of Richmond v. Crenshaw et al.,* 76 Va. 936; Washington: *Krieschel v. Board of Snohomish Co.,* 41 Pac. 186; *Rickey v. Williams,* 8 Wash. 479; Wisconsin: *Webster et al. v. Douglas Co.,* 102 Wis. 181; *Willard v. Comstock,* 58 Wis. 565; West Virginia: *Spilman v. City of Parkersburg et al.,* 35 W. Va. 605.

Our distinguished associate, Mr. Justice Hainer, in his valuable work on Municipal Securities, sec. 480, correctly states the rule thus:

"But the general rule is that a resident taxpayer, although he shows no special private interest, may invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the municipality, or the illegal creation of a debt which he, in common with other property owners, may otherwise be compelled to pay."

From the foregoing authorities it appears that there are two roads for us to choose from; one, a dim trail, traveled by but few, and beset with many difficulties; the other, a broad, well paved thoroughfare, numerously traveled, and leading to satisfactory results. Should there be any hesita-

tion? We think not. It is the duty of those charged with the authority of establishing the principles which shall underlie and furnish the basis for our jurisprudence, to adopt those rules which when applied to actual conditions, will bring about the best results to the community at large.

The supreme courts of the states of Ohio and New York in vigorous language denounced the rule first adopted by the courts in those states, and which is the same as now prevails in Kansas, and declared that its effect had been to practically deny justice to the taxpayers, and subject them to official pillage and robbery without remedy or means of redress. We prefer to adopt the rule which permits the taxpayer to invoke the aid of the courts to protect himself from being burdened with taxes to pay illegal obligations, and to prevent the consummation of unauthorized acts by municipal officers. That the district court, sitting as a court of equity, will by injunction restrain public officers from misappropriating public funds, or expending public funds at unauthorized places, or for unauthorized purposes, was settled by this court in the *Board of Education v. Taylor, County Attorney, ex rel.,* 70 Pac. 792.

In the case at bar, it is alleged that the school district is preparing to erect four separate school houses in one district, and assume the burdens of four schools, and has illegally issued a warrant on the treasurer for a large sum of money to enable them to carry out such purposes. If these allegations are true, and the legal conclusion correct, then Kellogg as a taxpayer and inhabitant of the school district has the right to maintain the action in this case.

This brings us to the consideration of the second propo-

sition embraced in the record. Did the court err in not rendering judgment for the plaintiff on the pleadings? If the board of trustees of a school district has the authority to erect as many school houses as they deem proper and at such places as they may determine, then the case was decided right by the trial court. Otherwise it was not, and this calls for the interpretation of our school laws. The school laws of this territory are intended to establish a comprehensive system of public schools, general in terms, as to all schools embraced in the system, and special as to particular schools or classes of schools. This system embraces the University, the Agricultural and Mechanical College, the Preparatory University, the several normal schools, the county high schools, union graded schools, city schools, and district schools; also the Agricultural and Normal College, and separate schools for colored pupils. This general law was enacted and took effect March 14, 1893, and for convenience we will refer to the statutes of 1893 and session laws amendatory or supplemental thereto.

By sec. 5760, the county superintendent is required to divide the county into a convenient number of school districts, and to change such districts when the interests of the inhabitants thereof require it, by making them conform to existing topographical and physical conditions, but no district shall be formed containing less than eight persons.    *    *    *    *

Sec. 5765.    Every district shall be a body corporate.

Sec. 5768.    An annual meeting of each school district shall be held    *    *    *    at the school house belonging to the school district.    *    *    *

Sec. 5770.    The clerk is required to give ten days notice

of special meetings, one of which notices shall be "affixed on the outer door of the school house."

Sec. 5773. The inhabitants qualified to vote at a school meeting shall have power "to designate by vote a site for the district school house." "Provided, that the designation of a site for a district school house shall not be over one-half mile from the center of said district." Shall vote a tax for school purposes, "and to purchase or lease a site," "and to build, hire or purchase such school house."

Sec. 5774. The qualified voters may "determine the length of time a school shall be taught," "and when such school shall be taught," "and whether the money shall be applied in support of the winter or summer term of school."

Sec. 5775. "That school districts having school houses, the value of which is not less than five hundred dollars, the school house site shall not be changed except by a vote of at least three-fifths of the legal voters of such district in favor of such change."

Sec. 5776. In case any district cannot "obtain title to a site selected by such school district," the district may condemn a site.

Sec. 5784. The clerk of each district is required to make a report in which he shall state "the number of children attending the school," and "the length of time a school has been taught in the district by a qualified teacher."

Sec. 5796. "The district school shall purchase or lease such a site for a school house," "and shall build, hire or purchase such school house as the voters of the district meeting shall have agreed upon,    *    *    *    ."

Sec. 5797. "The district board shall have the care and keeping of the school house    *    *    *    ."

Sec. 5813. "Whenever there is not sufficient money belonging to any school district to support a public school" tuition fees may be charged. Article 8 provides for separate schools where there are colored pupils. Article 7 makes provision for schools in cities of the first class, and declares each city of the first class a separate school district, and provides for such schools as may be necessary and for high schools, under the control and management of "the board of education of the city."

It will be observed that in every instance where school, school site or school house is mentioned in the law, the singular is invariably used. The plural is not made use of except in school districts embracing a city of the first class, or when districts are referred to where either separate schools, graded schools or high schools are authorized.

A school district is composed of certain contiguous territory, governed by one school board, authorized to select one school site, secure one school house, and conduct one school, except where separate schools are required for colored pupils. Under the law of 1890 we had the township system, with four schools in each township, governed and controlled by one board of trustees for each township, or for four schools. (Chap. 79, stat. 1890.) But in 1893 the legislature abolished this system, and substituted the district system, with one school for each district, and one school board for each school district. There is no law authorizing the country school district to erect a school house on but one site, or conduct but one school, unless as suggested, the district contains colored pupils entitled to a school.

It appears from the pleadings in the case at bar that

the school board for district No. 10, Comanche county, are erecting four school houses in the four quarters of the district, and intend to conduct four separate schools for white children in one district.   This leads us to the inquiry how the school board intends to determine what particular pupils in the district shall attend any particular school. The law gives each inhabitant of the district of school age the right to attend the public school of the district.   Who shall select for him? Will the best teacher get all of them? Or will the school board create sub-districts, and determine where each scholar shall attend?   The law makes no provision for such conditions, and gives the school board no such powers.   It would seem that the difficulties arising from such usurpation of authority would suggest its own illegality.   The acts of the board in attempting to construct four school houses in the one district are without authority,   and   the board has no power, nor has the district, to select more than one site nor to conduct more than one school in the district.   The law prohibits the electors from selecting a site more than one-half mile from the center of the district.   This provision is mandatory, and the board is required either to build on this site when so selected, or have a new site selected in the manner authorized by law.   If the district is too large for public convenience, it is the duty of the county superintendent   on proper application, to divide the district into a suitable and convenient number of districts and have a school board selected for each new district.   We think there is no reasonable question but that the legislature in devising our harmonious and complete system of public schools, intended each school district outside of an incorporated city, should embrace but

Kellogg v. School District No. 10 Comanche Co.

one school, and have but one school site and one school house. The board may employ as many teachers as may be necessary to teach the pupils, but there is no authority for conducting but one school in the district, and at but one site.

Our attention has been directed to article 6, chap. 73, stat. 1893, as amended by art. 2, chap. 7, laws 1895. This article relates to the issuing of bonds by school districts, and the purposes for which proceeds from the sale of such bonds may be used. This is a part of the general school law, and must be construed with reference to its various provisions. Sec. 1 reads: "That for the purpose of purchasing one or more school sites, erecting, purchasing or paying for and furnishing one or more school houses in and for any school district in the Territory of Oklahoma, the board of directors shall have power to issue bonds, *  *  *  ." It is contended that herein is the authority to select and obtain more than one site and construct more than one school house in any district. If this section stood alone, and was not required to be construed as a part of the whole general law on the subject of public schools, the contention would be tenable. But when we remember that a country school district is only authorized to select one  site  and erect one school house, that a district comprising a city of the first class is authorized to select as many sites as may be required for public schools in the city, and that a district comprising both white and colored pupils must have separate schools, and that the language used in article 6, as amended, is intended to be sufficiently comprehensive to embrace all these conditions without particularizing as to each, then it is made clear that the only power conferred by art. 6 is the authority to issue

bonds and apply the proceeds as required, and it was not the purpose of this provision to enlarge the powers of the several school boards in relation to the number of sites each can select, or the number of houses each may construct. To give this article any other interpretation would result in recognizing a conflict in the various provisions of the school laws, and this is not permissible, where all the parts can be harmonized without doing violence to the language used. If this is a correct interpretation of our school laws, then the defendant in error had no legal authority to adopt four sites for school houses, and had no power to contract for four school houses at four different sites in the district. And having admitted this in the answer, the trial court should have rendered judgment for the plaintiff in error, enjoining the defendant in error from contracting to construct more tnan one school house in the district, and this one not more than one-half mile from the center of the school district. It follows that there is error upon the face of the record.

It is also alleged in the petition that the defendant in error through its officers had issued a warrant for the sum of fifteen hundred dollars, and sold it for the sum of twelve hundred dollars, and invested the proceeds in lumber and building material. This allegation is also admitted by the defendant in error, but they allege that the warrant was voted by the electors at the school meeting, and has passed into tne hands of innocent purchasers for value. The latter conclusion is untenable. School warrants are not negotiable paper, and the purchaser or assignee of such paper takes it subject to all defects and defenses. The law prescribes the mode of issuing warrants, and how the school funds shall be

appropriated, and one who takes a school warrant for value or otherwise, is required to take notice of all the proceedings of the board leading up to its issue, and if the warrant has been illegally issued, a taxpayer may enjoin its payment. The members of the school board for the district are trustees for the taxpayers of the district, and can only exercise such powers as are vested in them by statute, or such as are necessarily incident to those specifically conferred. In dealing with the revenues of the school district, the board must follow the mode prescribed by law, or in the absence of statute, the modes in common usage. The members of the board are not permitted to deal or speculate in the warrants of the school district, nor to depreciate its credit. The board are empowered under certain conditions to contract for the erection of a school house, and as an incident to this power may lawfully contract for building material with which to construct such house. But in doing this, they have no right to issue a warrant to some fictitious or real person for some imaginary purpose, and then take such warrants themselves and barter it away for any legitimate purposes. This is speculating upon the credit of the beneficiaries whom they are bound to protect. Such conduct is against public policy, and subverts the ends of judicious municipal government. The board has no power to order a warrant drawn except in payment of a valid claim or demand against the school district, presented to the board, passed upon at a regular meeting, and allowed. Warrants cannot be issued in anticipation of the needs of the district, and then sold for cash and the proceeds used to make purchases. This is doing indirectly what the district has no power to do directly, to-wit: Borrow

money. The board is only empowered to borrow money by the issuance and sale of bonds, and not by the issuance and sale of warrants. It appears in the case at bar that the school board issued a warrant for fifteen hundred dollars, and sold it for twelve hundred dollars, and bought lumber with the money, thus discounting their own credit twenty per cent. before they had contracted a valid obligation. This was a violation of the official duties of the board, and in violation of their trust, and the rights of the taxpayers of the district. If the district desired to purchase lumber, the board should have let a contract to the lumber dealer for the material on the best terms obtainable, had the dealer file his account with the board, then the same should have been allowed and ordered paid, and a warrant issued in favor of the dealer. This is the only manner recognized by law, common usage or good government for transacting such affairs, and the warrant having been issued in violation of law and sold without authority, the whole proceedings so far as relates to the warrant are illegal and void, and the purchaser of the warrant took the same with full notice of all such irregularities and defects, and it is not necessary to make him a party to this action in order to determine the rights of a taxpayer. This action cannot affect his legal rights whatever they may be, and he must seek his legal remedy at the proper time. But the taxpayer who has been injured by the illegal acts of the officers of the school district, may have the district enjoined from paying the warrant, and let the holder resort to the proper action for his protection.

The allegations of the petition and the admissions of the answer, together with the judgment of record, show that the

court erred in rendering judgment for the defendants in error.

The judgment of the district court of Comanche county is reversed, and the cause remanded to the district court with directions to render judgment for the plaintiff in the case below, enjoining the school district and its officers from taking further steps towards erecting more than one school house, and that not more than one-half mile from the center of the school district, and restraining the payment of the warrant referred to in the pleadings, and it is further ordered that the plaintiff in error recover his costs in this court.

Gillette, J., who presided in the court below, not sitting; all the other Justices concurring.