2007 OK 27

**Jerry R. FENT, as a resident taxpayer, citizen and voter of the State of Oklahoma, and all other similar persons, Petitioner,**

v.

**CONTINGENCY REVIEW BOARD, a State of Oklahoma Agency; Brad Henry, Governor of Oklahoma; Todd Hiett, Speaker of the House, and Mike Morgan, President Pro Tempore of the Senate, Respondents.**

No. 103,714.

Supreme Court of Oklahoma.

May 1, 2007.

Jerry R. Fent, Oklahoma City, Oklahoma, pro se.

Edwin Kessler, Norman, Oklahoma, pro se.[1]

Lynn C. Rogers and Scott Boughton, Assistant Attorneys General, Oklahoma City, Oklahoma, for Respondents Contingency Review Board, Governor Brad Henry and Speaker Todd Hiett.

Judith S. King, Oklahoma State Senate, and Lee Slater, Oklahoma City, Oklahoma, for Respondent President Pro Tempore Mike Morgan.[2]

OPALA, J.

¶ 1 The dispositive issues tendered by this original proceeding are: (1) Is the mandatory participation by the legislative members of the Contingency Review Board (CRB) in the process of approval of expenditures from appropriations to the Oklahoma Opportunity Fund [3] (Opportunity Fund) an impermissible intrusion upon the executive branch's powers in violation of Art. 4, § 1, Okl. Const.? [4] and if so (2) Are the offending provisions of 62

1. Edwin Kessler filed a petition for declaratory judgment in this case. He did not submit a separate brief and makes no claim apart from that pressed by Fent. There was no objection to Kessler's quest to join Fent's claim. Because we grant the very relief that Fent seeks, we need not make any other mention of Kessler's claim.

2. Identified herein are only those counsel for the parties whose names appear on the briefs and who have entered an appearance in this cause

(as required by Okla.Sup.Ct.R. 1.5(a), 12 O.S. 2001, Ch. 15, App.1).

3. For the Oklahoma Opportunity Fund enactment, see the provisions of 62 O.S.Supp.2006 § 48, *infra* note 7.

4. The provisions of Art. 4, § 1, Okl. Const., are: The powers of the government of the State of **Oklahoma shall be divided into three separate departments**: The Legislative, Executive, and Judicial; and except as provided in this Consti-

O.S.Supp.2006 § 48 [5] severable from the remainder of the Act? and (3) Is the CRB's approval of funding to the Ardmore Development Authority for two related projects void *ab initio?* We answer the first two questions in the affirmative and the third in the negative.[6]

## I

### THE ANATOMY OF LITIGATION

¶ 2 Petitioner Jerry R. Fent (petitioner or Fent), a resident taxpayer, invokes this court's original jurisdiction to challenge the legality of the CRB, of the status of the two legislator members who sit on that board, as well as of the CRB's approval of funding that was to flow from the Opportunity Fund to the Ardmore Development Authority (Authority) for two projects in the Ardmore area.

¶ 3 The Opportunity Fund, created by the terms of 62 O.S.Supp.2006 § 48,[7] is a revolving fund for the Department of Commerce to be used for economic development projects.

tution, the Legislative, Executive, and Judicial departments of government **shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.**
(emphasis supplied).

5. For the provisions of 62 O.S.Supp.2006 § 48, see *infra* note 7.

6. Fent's argument that the Board's composition violates the "dual-office-holding" prohibition in Art. 5 § 23, Okl. Const., need not be reached. We grant the relief sought by acceding to Fent's view that the separation-of-powers doctrine stands offended.

7. The terms of 62 O.S.Supp.2006 § 48 are:

A. There is hereby created in the State Treasury a revolving fund for the Oklahoma Department of Commerce to be designated the "Oklahoma Opportunity Fund". The fund shall be a continuing fund, not subject to fiscal year limitations and shall consist of:
    1. All monies apportioned or allocated to the fund pursuant to law;
    2. Any amounts appropriated by the Legislature to the fund;
    3. Interest earned on the investment of money in the fund; and
    4. Gifts, grants, and other donations received for the fund.
B. All monies accruing to the credit of the fund are hereby appropriated and may be budgeted and expended by the Governor for the purposes of economic development and related infrastructure development, **subject to the unanimous approval of the Contingency Review Board pursuant to subsection E of this section.** Expenditures from the fund shall be made upon warrants issued by the State Treasurer against claims filed as prescribed by law with the Director of State Finance for approval and payment.
C. Expenditures from the Oklahoma Opportunity Fund shall be proposed by the Director of the Oklahoma Department of Commerce. The Director of the Oklahoma Department of Commerce shall only propose expenditures that the Director determines are expected to result in a substantial economic benefit to the state through any of the following:
    1. The creation of new jobs which offer a basic health benefit plan, as defined in the Oklahoma Quality Jobs Program Act;
    2. The maintenance of existing jobs which are at risk for termination;
    3. Investment in new real property, plant or equipment or in the improvement or retooling of existing plant or equipment; or
    4. Additional revenues in either ad valorem, income or sales and use taxes.
D. The Oklahoma Department of Commerce shall develop rules for the process of reviewing proposed expenditures from the Oklahoma Opportunity Fund and for determination of whether or not proposed expenditures meet the criteria identified in subsection C of this section. Criteria shall include requirements for economic impact, local participation in the project and average wage thresholds.
E. No expenditure shall be made from the Oklahoma Opportunity Fund **unless such expenditure has been unanimously approved by the Contingency Review Board.**
F. The Oklahoma Department of Commerce shall administer the Oklahoma Opportunity Fund. The Governor may, on behalf of this state and **with the express approval of the Contingency Review Board,** award monies by entering into a written agreement.
G. Before awarding any monies pursuant to subsection F of this section, the Governor shall enter into a written agreement with the entity to be awarded the money specifying that:
    1. If any or all of the amount to be awarded is used to build a capital improvement:
    a. the state retains a lien or other interest in the capital improvement in proportion to the amount awarded by the written agreement for the capital improvement, and
    b. if the capital improvement is sold, the recipient of the award shall:
    (1) repay to the state the money awarded to pay for the capital improvement, with interest at the rate and according to the other terms provided by the agreement, and
    (2) share with the state a proportionate amount of any profit realized from the sale; and

The enactment establishes explicit criteria for determining whether proposed expenditures are expected to result in a substantial economic benefit to the State. The Director of the Department of Commerce is authorized to administer the Opportunity Fund [8] and to propose expenditures from the fund in accordance with the legislative guidelines.[9] Appropriations to the fund may be budgeted and expended by the Governor for proposed projects subject to the unanimous approval of the CRB.[10] The CRB is composed of the Governor, Speaker of the House of Representatives, President *Pro Tempore* of the Senate and Director of State Finance (an *ex officio* nonvoting member).[11] The Opportunity Fund received a $45,000,000 appropriation during the second extraordinary legislative session in 2006.[12] The CRB approved Authority's application for two grants in the aggregate amount of $20,000,000 for a project related to a new MG automobile plant: [13]

(1) a $5,000,000 loan to Oklahoma Global Motors, LLC to assist it in start-up operations to manufacture MG automobiles in Ardmore and (2) a $15,000,000 award for improvements to be made at the Ardmore Municipal Airport, which would enable the airport to accommodate cargo aircraft for use in transporting manufactured MG automobiles.[14]

## II

### THE PARTIES' ARGUMENTS

¶ 4 Fent claims the CRB's mandated participation in the approval process for all expenditures from appropriations to the Opportunity Fund (for economic development projects) contravenes the State's constitutional separation-of-powers provision.[15] This is so because two legislators, who sit as

2. If, as of the date certain provided in the agreement, the award recipient has not used monies awarded under this section for the intended purposes, the recipient shall repay that amount and any related interest to the state at the agreed rate and on the agreed terms.
H. The Legislature finds that for profit entities, nonprofit entities and state and local governmental entities that qualify for funding pursuant to the provisions of this section are a source of economic benefits for the state, its political subdivisions and its residents that can only be achieved through the use of specialized economic incentives. All expenditures from the Oklahoma Opportunity Fund shall be deemed to be in furtherance of essential governmental functions for public purposes as a method of promoting and sustaining economic growth and activity within the State of Oklahoma.

8. *Id.* at 62 O.S.Supp.2006 § 48(F).

9. *Id.* at 62 O.S.Supp.2006 § 48(C).

10. *Id.* at 62 O.S.Supp.2006 § 48(B).

11. 74 O.S.2001 § 3605(A).

12. 62 O.S.Supp.2006 § 46.1(B)(2).

13. The CRB's funding resolution of 28 July 2006, signed by Governor Brad Henry, Todd Hiett, Speaker of the House, and Mike Morgan, President *Pro Tempore* of the Senate, states:

COMES NOW, the Continency Review Board and on this 28th day of July 2006 hereby unanimously approves funding to the Ardmore

Development Authority in the amount of $20,000,000, to be used as follows:
1. Funding in the amount of $15,000,000 for improvements to the Ardmore Municipal Airport to accommodate cargo aircraft to assist in the manufacture of MG automobiles in Ardmore.
2. Funding in the amount of $5,000,000 to be loaned to Oklahoma Global Motors, LLC, by the Ardmore Development Authority pursuant to the terms and conditions to be negotiated between the Ardmore Development Authority and Oklahoma Global Motors, LLC. The loan proceeds are to assist Oklahoma Global Motors, LLC in the start-up of operations in Ardmore to manufacture MG automobiles. The loan repayments, both principal and interest, are to be returned to the Oklahoma Department of Commerce to be deposited in the Oklahoma Opportunity Fund account at the Oklahoma Department of Commerce.
Pursuant to 62 O.S. § 48, the State shall retain a lien or other interest on any capital improvements built with the above funding."

14. Respondents informed us by notice filed in this case on 8 December 2006 that (1) a warrant for $5,000,000 had been issued to the Authority on 25 July 2006 for a loan to Oklahoma Global Motors, LLC, and (2) on 14 December 2006 the Department of Commerce intended to reimburse the Authority in the sum of $489,932 for work that had been completed to date for the airport extension project. The parties' filings did not tender any request for the court's *pendente lite* restriction on this spending.

15. See the provisions of Art. 4 § 1, Okl. Const., *supra* note 4.

members of the CRB, have the power to veto funding for proposed projects selected by the executive service. He challenges the legitimacy of the CRB as an "executive" board because it is composed of two legislator-members who sit *ex officio*.[16] He claims the legislators sitting on the CRB are both serving simultaneously in the executive as well as in the legislative capacities in violation of the state constitutional prohibition against holding dual state offices.[17]

¶ 5 Respondents counter the CRB is essentially a legislative body acting in support of a legislative function—the determination of State fiscal policy on a matter of great public importance. They claim the CRB acts in a cooperative, not coercive, manner, when it participates in the approval process. According to Respondents, even if we assume the statutory approval regime is unlawful, the offending language is severable from the remainder of the act without any harm to its essential character.

## III

### FENT'S STANDING

¶ 6 Fent claims he has standing [18] as an Oklahoma resident taxpayer, citizen and voter **to challenge as constitutionally infirm** (a) *the expenditure of public tax-derived funds* in the amount of $20,000,000, (b) *the CRB,* an executive board composed of two legislative and one executive voting members, whose mandatory participation in the approval of expenditures to be made out of appropriations to the Opportunity Fund offends the separation-of-powers doctrine, Art. 4 § 1, Okl. Const., and (c) the role of the *President Pro Tempore of the Senate* and the *Speaker of the House,* both of whom sit on the CRB in contravention of the dual-office-holding prohibition of Art. 5 § 23, Okl. Const. Fent's claim to standing is unchallenged by the respondents. Since standing, very much like jurisdiction, must be inquired into *sua sponte,*[19] we must pass here *sua sponte* on Fent's standing.

¶ 7 Standing refers to a person's legal right to seek relief in a judicial forum.[20] The three threshold criteria of standing are (1) a legally protected interest which must have been injured in fact *i.e.,* suffered an injury which is actual, concrete and not conjectural in nature, (2) a causal nexus between the injury and the complained-of conduct, and (3) a likelihood, as opposed to mere speculation, that the injury is capable of being redressed by a favorable court decision.[21] The doctrine of standing ensures a party has a personal stake in the outcome of a case and

16. This court notes and stresses that any questions concerning the validity or constitutionality of the CRB with regard to any power it may exercise outside the provisions of 62 O.S.Supp. 2006 § 48 is not before the court. Today's pronouncement is not to be viewed as impacting the validity of the CRB or of its duties *dehors* this controversy.

17. Because we hold the CRB's mandated participation in the approval of grants from the Opportunity Fund is a legislative usurpation of the executive service's powers, we need not consider Fent's argument that the CRB's composition is violative of the dual-office-holding prohibition in Art. 5 § 23, Okl. Const.

18. For support of his standing position, Fent relies on *Oklahoma Public Employees Ass'n v. Oklahoma Dept. Of Central Services,* 2002 OK 71, 55 P.3d 1072; *Payne v. Jones,* 1944 OK 86, 146 P.2d 113, 117, 193 Okl. 609; *Vette v. Childers,* 1924 OK 190, 228 P. 145, 102 Okl. 140; *Town of Afton v. Gill,* 1916 OK 393, 156 P. 658, 57 Okl.

36; *Kellogg v. School Dist. No. 10 of Comanche County,* 1903 OK 81, 74 P. 110, 116, 13 Okl. 285.

19. Standing may be raised at any stage of the judicial process or by the court on its own motion. *Hendrick v. Walters,* 1993 OK 162, ¶ 4, 865 P.2d 1232, 1236; *Matter of Estate of Doan,* 1986 OK 15, ¶ 7, 727 P.2d 574, 576.

20. *Hendrick v. Walters, supra* note 19, at ¶ 4, 865 P.2d at 1236; *Democratic Party of Oklahoma v. Estep,* 1982 OK 106, ¶ 7, 652 P.2d 271, 274; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)(the doctrine of standing serves to "identify those disputes which are appropriately resolved through the judicial process") (citations and internal quotation marks omitted).

21. *Cities Service Co. v. Gulf Oil Corp.,* 1999 OK 16, ¶ 3, 976 P.2d 545, 547; *Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, ¶ 8, 890 P.2d 906, 910, citing *Lujan v. Defenders of Wildlife, supra* note 20, 504 U.S. at 560, 112 S.Ct. at 2136;

the parties are truly adverse.[22]

■ ¶8 This court has long-recognized the right of a taxpayer to challenge illegal taxation or expenditure of public funds.[23] The unlawful **appropriation** or **expenditure** of public funds is deemed to be an invasion of the taxpayer's legal rights.[24] A taxpayer also has a vital interest in (a) the **unimpeded use of appropriated funds** (b) by its destined recipient (c) for the purpose for which the fund was intended (d) without unlawful legislative interference. There is an injury to the public interest when the Legislature places unlawful barriers to a recipient agency's access to appropriated funds by interposing its own control over an appropriation bill beyond the point in time at which that bill passes outside the legitimate zone of legislative control.[25] A taxpayer's challenge to the constitutionality of legislation affecting the use of public funds is a matter of public right.

¶9 The claimed public injury in this case consists of the Legislature's usurpation of the executive branch's power (to use appropriated funds) through legislative post-passage interposition of an improper veto barrier which legislative officials may use when sitting on the CRB. That injury is redressable by judicial severance of the offending provisions of 62 O.S.Supp.2006 § 48(B) from the remainder of the statute.

## IV

## ORIGINAL JURISDICTION

¶10 Respondent Morgan submits there is no urgency or pressing need for an early decision.[26] He argues this case is analogous to the scenario in *Keating v. Johnson,*[27] in which this court declined to assume original jurisdiction of the Governor and of two state representatives in a *publici juris* case in

*Raines v. Byrd,* 521 U.S. 811, 818–19, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997).

22. *Hendrick v. Walters, supra* note 19, at ¶5, 865 P.2d at 1237; *Raines v. Byrd, supra* note 21, 521 U.S. at 820, 117 S.Ct. at 2318 ("the law of ... standing is built on a single basic idea-the idea of separation of powers") (citations omitted).

23. *Oklahoma Public Employees Ass'n v. Oklahoma Dept. Of Central Services, supra* note 18, at ¶10, 55 P.3d at 1077 (a taxpayer has standing to seek equitable relief when alleging that a violation of a statute will result in an illegal expenditure of public funds or the imposition of an illegal tax)(citing *Kellogg v. School Dist, supra* note 18, at 116). *Accord Thompson v. Haskell,* 1909 OK 140, ¶6, 102 P. 700, 704, 24 Okl. 70; *Airy v. Thompson,* 1931 OK 770, ¶12, 6 P.2d 445, 447–448, 154 Okl. 1; *Payne v. Jones, supra* note 18, at ¶11, 146 P.2d at 117; *Brandon v. Ashworth,* 1998 OK 20, ¶¶6–7, 955 P.2d 233, 235; *Quinn v. City of Tulsa,* 1989 OK 112, ¶48, 777 P.2d 1331, 1340. In *Vette v. Childers, supra* note 18, at ¶0, syl.1, 228 P. at 145, the court explained: "A resident taxpayer has an equitable ownership in funds in the state treasury, and, although no private interest, he may invoke the interposition of a court of equity to restrain the payment of money appropriated by the Legislature in violation of the Constitution. The unlawful appropriation of public funds is an invasion of the legal rights of a taxpayer, and a suit may be maintained to restrain such expenditure without waiting for the state officers to take further steps toward the expenditure of the funds appropriated." *See also extant jurisprudence in which the taxpayer-litigant's standing was neither challenged nor addressed. Fent v. State ex rel. Oklahoma Tax Com'n,* 2004 OK 59, 99 P.3d 241

(plaintiff pressed a claim for a declaratory judgment that Oklahoma's earned income credit statute is unconstitutional); *Fent v. Oklahoma Capitol Improvement Auth.,* 1999 OK 64, 984 P.2d 200 (taxpayers challenged the constitutionality of statutes authorizing the Oklahoma Capitol Improvement Authority to issue over $300 million in bonds to fund various governmental projects); *Oklahoma Ass'n. for Equitable Taxation v. City of Oklahoma City,* 1995 OK 62, 901 P.2d 800 (taxpayer pressed a claim for declaratory and injunctive relief, challenging as constitutionally infirm a city-approved sales tax refund provision); *Baker v. Carter,* 1933 OK 484, 25 P.2d 747, 165 Okl. 116 (the plaintiff pressed a claim to enjoin the State Auditor and the members of the State Board of Agriculture from issuing and selling bonds for the purpose of erecting dormitories on a state college campus).

24. *Vette v. Childers, supra* note 18, syl.1, 228 P. at 145.

25. See Part V. *infra* for a discussion of legislative and executive control over an appropriation bill.

26. Respondent Morgan directs us to extant jurisprudence in which this court declined to accept original jurisdiction. *See Application of Sewer Improvement District No. 1, Tulsa County,* 1950 OK 64, ¶8, 216 P.2d 303; *Keating v. Johnson,* 1996 OK 61, 918 P.2d 51.

27. *Keating v. Johnson, supra* note 26 (a request to assume original jurisdiction was rejected in a case in which the Governor and two state representatives pressed a claim to have certain legisla-

which an issue of governmental power's usurpation was raised. Petitioner, on the other hand, urges this court to take original jurisdiction and decide the state constitutional issues that are pressed here.

¶ 11 This case is appropriate for the court's assumption of original jurisdiction to grant declaratory relief. In controversies where (as here) this court and the district court both have concurrent jurisdiction, this court's decision to assume original jurisdiction constitutes an exercise of discretionary power.[28] Jurisdiction to grant declaratory relief may be assumed (1) in matters of public interest where there is (2) an element of urgency or a pressing need for an early decision.[29] Both of these prongs are met here. The funding of state programs is clearly a matter *publici juris*.[30] The Legislature has appropriated $45,000,000 to the Opportunity Fund for the development of economic activity in the State. There is a pressing need here for an early determination of the legitimacy of the CRB's role in the approval-of-expenditures process designed to expend money appropriated to the Opportunity Fund. The **continued disbursement** of those funds from the state treasury to the Ardmore recipient, **the approval and**

**funding of future projects** as well as **future legislative appropriations** to the Opportunity Fund will remain under a heavy cloud of legal uncertainty until the constitutional claims pressed by Fent are resolved. We hence exercise our discretionary authority to take original jurisdiction and rule on these fundamental-law challenges.

## V

## THE STATE'S FUNDAMENTAL LAW PROHIBITS THE LEGISLATURE FROM INTERPOSING ITS POWER OVER AN APPROPRIATION THAT HAS ALREADY BECOME ENACTED LAW

¶ 12 Oklahoma's fundamental law [31] interdicts legislative intrusion upon the functions assigned by the constitution to the executive.[32] Legislative power is mainly confined to making law,[33] while the executive department is invested primarily with the function of executing the law.[34] Passing an appropriation bill is clearly a legislative lawmaking function [35] while the administration of appropriated funds is a purely executive task.[36]

---

**28.** *Keating v. Johnson, supra* note 26, 918 P.2d at 55.

**29.** *Edmondson v. Pearce*, 2004 OK 23, ¶ 11, 91 P.3d 605, 613; *Keating v. Johnson, supra* note 26, 918 P.2d at 55; *Application of State ex rel. Dept. of Transp.*, 1982 OK 36, ¶ 8, 646 P.2d 605, 609.

**30.** *Edmondson v. Pearce, supra* note 29 at ¶ 11, 91 P.3d at 613; *Application of State ex rel. Dept. of Transp., supra* note 29, 646 P.2d at 609.

**31.** By Oklahoma's fundamental law the functions of government are expressly divided among three branches, each of which is forbidden from encroaching upon the powers and responsibilities of the other. See the provisions of Art. 4 § 1, Okl. Const., *supra* note 4; *Earl v. Tulsa County Dist. Court*, 1979 OK 157, ¶ 6, 606 P.2d 545, 547; *Puckett v. Cook*, 1978 OK 108, 586 P.2d 721, 722–23; *Jones v. Freeman*, 1943 OK 322, 146 P.2d 564, 573, 193 Okl. 554; *Sterling Refining Co. v. Walker*, 1933 OK 446, 165 Okl. 45, 25 P.2d 312, 317–20, syl. 4.

**32.** *Tweedy v. Oklahoma Bar Association*, 1981 OK 12, ¶ 9, 624 P.2d 1049, 1054.

**33.** *Yocum v. Greenbriar Nursing Home*, 2005 OK 27, ¶ 13, 130 P.3d 213, 220.

**34.** *Tweedy v. Oklahoma Bar Association, supra* note 32 at ¶ 9, 624 P.2d at 1054 (the power to execute law is purely an executive function). *See Springer v. Government of Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928), where the Court states: "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint agents charged with the duty of such enforcement. The latter are executive functions."

**35.** The pertinent terms of Art. 5 § 55, Okl. Const., are: "No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law. . . ." *See City of Sand Springs v. Department of Public Welfare*, 1980 OK 36, 608 P.2d 1139, 1148 ("the appropriation of moneys for the various State purposes rests in the sole discretion of the Legislature").

**36.** *Tweedy v. Oklahoma Bar Ass'n, supra* note 32 at ¶ 9, 624 P.2d at 1054.

¶ 13 Legislative control over an appropriation bill may continue until the bill passes beyond the point at which the Legislature may recall it from the Governor's office.[37] The power over a bill, once enacted, stands transferred by operation of law to the executive branch for spending the funds in accordance with the legislative direction.[38] The Legislature can exercise no supervision, either **directly or indirectly**, over the manner in which appropriated funds are to be used. The proper exercise of legislative oversight with respect to enacted appropriations is through a post-expenditure performance audit.[39] Any extra-constitutional method by which the Legislature extends its tentacles of control over an appropriation measure beyond the time when the measure stands transformed into enacted law offends the constitutional concept of separated powers and becomes a usurpation of power.

¶ 14 When the 2006 appropriation to the Opportunity Fund became enacted law, all legislative control over the funds ceased and passed to the executive branch to expend them for economic development projects selected by that service of government based on the expressly imposed legislative criteria. By statutorily requiring the CRB's unanimous approval of all expenditures from the Opportunity Fund,[40] the Legislature, acting through its presiding officers sitting on that board, impermissibly extended its reach of power over enacted appropriations. This is so because the CRB's legislative members stand ultimately in control of all disbursements from the fund through their exercise of veto power over the projects proposed by the executive service. The CRB was initially created as a mechanism for dealing with unexpected personnel and expenditure needs of various agencies when the Legislature is

37. Insofar as we can ascertain from a perusal of legislative rules and journals, there are no legislative rules for recalling bills that have been presented to the Governor, although a custom appears to have developed which governs this procedure. Bills on which final action by the Governor is pending have been recalled by a concurrent resolution adopted by both houses. *See, e.g.*, HCR 1029 (a concurrent resolution recalling from the Governor Enrolled House Bill No. 1101)(House Journal, 1st Session of the 49th Oklahoma Legislature, May 7, 2003); SCR 55 (a concurrent resolution recalling from the Governor Enrolled Senate Bill No. 879)(Senate Journal, 2nd Session of the 49th Oklahoma Legislature, March 24, 2004). In the past the recall of bills has been governed by joint rules adopted by both houses of the Legislature. *See, e.g.*, HCR 1001 (a concurrent resolution adopting joint rules for the 47th Oklahoma Legislature)(House Journal, 1st Session of the 47th Oklahoma Legislature, January 5, 1999)(Rule 21 of the joint rules dealt with the recall of bills and joint resolutions from the Governor).
A bill not vetoed by the Governor within five days (excluding Sundays) of its presentment automatically becomes law (unless it is submitted in less than five days before adjournment). Art. 6 § 11, Okl. Const. **The Legislature loses control of a bill after the five-day recall period.**

38. See in this connection Opinion of the Justices to the Senate, 375 Mass. 827, 376 N.E.2d 1217, 1222 (1978) ("the activity of spending money is essentially an executive task").

39. The only effective method legally available to the Legislature for overseeing executive conformity to the legislative will is through its power to conduct a post-factum performance audit. A " 'performance post audit' means an examination of the effectiveness of administration and its efficiency and adequacy in terms of the program of a state agency, authorized by law to be performed, and the conformance of expenditures with legislative intent in the appropriation of funds. ...." 74 O.S.2001 § 452.4. The performance-audit function is assigned to the Legislative Service Bureau. 74 O.S.2001 § 452.4. The Legislature through a statutory bi-partisan Legislative Oversight Committee on State Budget Performance conducts program evaluations and performance reviews of state agencies. The review must "be comprehensive in its scope, but, at a minimum, must be conducted in such a manner as to specifically determine what changes, if any, are needed." 62 O.S.2001 § 45.9. One of its duties is the "[o]versight and reporting on executive branch compliance with the legislative intent of appropriation measures." 62 O.S.Supp.2003 § 41.47(B)(4). The Legislative Review of State Audits Act requires each state agency to furnish copies of all audits performed on its entity to the Legislature. 74 O.S.Supp.2002 § 452.11 *et seq.;* 74 O.S.Supp. 2002 § 452.10. The Legislature has created a standing Joint Committee on Accountability in government which conducts "a performance investigation of a state agency to consider to what extent an agency has improved performance." 62 O.S.2001 § 45.8(B).

40. See the terms of 62 O.S.Supp.2006 § 48, *supra* note 7.

not in session.[41] That original purpose which the board was to serve is far removed from the function the Legislature assigned to it by the terms of 62 O.S.Supp.2006 § 48–the post-passage oversight of enacted legislative appropriations to the Opportunity Fund.[42]

¶ 15 In *In re Oklahoma Department of Transportation for Approval of Not to Exceed $100 Million Oklahoma Department of Transportation Grant Anticipation Notes, Series 2002*[43] the court considered the CRB's statutory role in approving grant anticipation notes for funding a highway improvement and expansion plan. Applying a four-factor test,[44] the court there held the power wielded by the President *Pro Tempore* of the Senate and the Speaker of the House of Representatives as members of the CRB appeared potentially coercive and constituted a significant interference with the executive branch in the issuance of grant anticipation notes. Applying that earlier analysis to this case, we reach the same conclusion today. The challenged statutory scheme, which gives the Legislature's presiding officers absolute veto power over executive-proposed expenditures from the Opportunity Fund (derived from enacted appropriations), is an impermissible interposition of legislative power over an appropriation that has already become law and by operation of the constitution passed beyond the Legislature's reach for control.

¶ 16 **In short, the Legislature cannot participate, either directly or through administrative boards having legislators as members, in the administration of funds appropriated by enacted legislation. The CRB's participation in the approval process constitutes a legislative usurpation of the powers assigned to the executive branch.**

## VI

## SEVERABILITY ANALYSIS

■ ¶ 17 Respondents submit that even if the CRB's statutory role in approving expenditures from the Opportunity Fund be declared constitutionally infirm, the provisions claimed to be offending are clearly severable.

■ ¶ 18 Severability analysis is a necessary process when some, but not all, provisions of an enactment are to be condemned as unconstitutional and hence void.[45] Its purpose is to determine whether non-offending statutory provisions may survive as valid after the clauses rejected as invalid are separated from the whole. The severability of a statutory enactment is not contingent on the presence of an express severability clause within the particular enactment's text.[46]

**41.** 74 O.S.2001 § 3603(A)-(C). *See In re Oklahoma Department of Transportation for Approval of Not to Exceed $100 Million Oklahoma Department of Transportation Grant Anticipation Notes, Series 2002*, 2002 OK 74, ¶ 23, 64 P.3d 546, 552.

**42.** See the provisions of 62 O.S.Supp. § 48, *supra* note 7.

**43.** *Supra* note 41.

**44.** The court applied the test formulated in *State ex rel Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786, 792–93 (1976)—(1) the essential nature of the powers being exercised, (2) the degree of control by the legislative department in the exercise of the power, (3) the objective of the Legislature and (4) the practical consequences of the action, if available.

**45.** Considerations relevant to a severability analysis are outlined in the provisions of 75 O.S.2001 § 11a. The pertinent terms of § 11a are:

In the construction of the statutes of this state, the following rules shall be observed:
1. For any act enacted on or after July 1, 1989, unless there is a provision in the act that the act or any portion thereof or the application of the act shall not be severable, the provisions of every act or application of the act shall be severable. If any provision or application of the act is found to be unconstitutional and void, the remaining provisions or applications of the act shall remain valid, unless the court finds:
a. the valid provisions or application of the act are **so essentially and inseparably connected with,** and **so dependent upon,** the void provisions that the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one; or
b. the **remaining valid provisions** or applications of the act, **standing alone, are incomplete and are incapable of being executed** in accordance with the legislative intent.
(emphasis added).

**46.** "Severability of the non-offending sections . . . does not necessarily depend on the presence of the clause." *Ethics Com'n. of State of Oklahoma v. Cullison*, 1993 OK 37, ¶ 25, 850 P.2d 1069, 1077. See also *United States v. Jackson*, 390 U.S. 570, 585, n. 27, 88 S.Ct. 1209, 1218, n. 27, 20 L.Ed.2d 138 (1968).

Survival of untainted statutory provisions that remain is appropriate when the valid and voided (as unconstitutional) provisions are not so "inseparably connected with and so dependent upon" each other that the surviving provisions would not have otherwise been enacted.[47] Consideration must be given to whether the surviving provisions must rely on the severed portion for meaning or enforcement.[48]

¶ 19 Because the CRB's statutory role in the supervision of money that is to flow to the Opportunity Fund is constitutionally infirm, we must next determine whether upon severance of the offending portions the remainder of the statute can be saved. The obvious legislative purpose of the Opportunity Fund is to promote economic development by funding projects that would result in a significant benefit to the State. This is to be accomplished by utilizing the Department of Commerce to administer the appropriations for selected projects that meet the statutory criteria.[49] The Legislature intended for the Governor to budget and expend appropriations to the Opportunity Fund and to award monies to qualified recipients by entering with them into written agreements. In our view, the Legislature would have authorized the Governor and the Department of Commerce to participate in the selection of economic development projects with or without the CRB's approval. The invalid provisions

in § 48–relating to the CRB-are presumed to be severable and Fent has failed to overcome this statutory presumption.[50]

¶ 20 **We therefore hold the provisions of 62 O.S.Supp.2006 § 48,[51] which require the CRB's participation in the approval of expenditures from the Opportunity Fund, are severable from the remainder of the statute.**

## VII

### THE ART. 10 §§ 15, 20, OKL.CONST. CHALLENGES

¶ 21 Fent claims the "subject matter" of the Ardmore grants contravenes two state constitutional provisions—Art. 10 §§ 15[52] and 20.[53] First, he argues the $15,000,000 grant violates the Art. 10 § 20 prohibition against the imposition of taxes "for the purpose of any county, city, town, or other municipal corporation."[54] He states the airport and its runway are not state facilities. He next asserts the $5,000,000 loan to Oklahoma Global Motors, a private entity, expressly violates the terms of Art. 10 § 15, which prohibit the State from offering its credit to a private corporation.

¶ 22 There is a strong presumption which favors the constitutionality of legislative acts.[55] A party challenging the constitutionality of legislation has a heavy

---

**47.** *Ethics Com'n. of State of Oklahoma v. Cullison, supra* note 46, at ¶ 25, 850 P.2d at 1077 (a presumption of severability arises under the provisions of 75 O.S.2001 § 11a unless "(1) the non-offending portions [are] so connected with and dependent upon the unconstitutional portion that we cannot presume the Legislature would have enacted the former without the latter, or (2) that the non-offending portions are incapable of standing alone").

**48.** See the provisions of 75 O.S.2001 § 11a, *supra* note 45; *Ethics Com'n. of State of Oklahoma v. Cullison, supra* note 46, at ¶ 26, 850 P.2d at 1077.

**49.** For the statutory criteria, see the provisions of 62 O.S.Supp.2006 § 48, *supra* note 7.

**50.** See the provisions of 75 O.S.2001 § 11a(1), *supra* note 45.

**51.** For the provisions of 62 O.S.Supp.2006 § 48, *see supra* note 7.

**52.** The pertinent terms of Art. 10 § 15, Okl. Const., are:

A. Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State. . . .

**53.** The terms of Art. 10 § 20, Okl. Const., are:

The Legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes.

**54.** *Id.*

**55.** *TXO Production Corp. v. Oklahoma Corp. Com'n.,* 1992 OK 39, ¶ 7, 829 P.2d 964, 968; *Black v. Ball Janitorial Service, Inc.,* 1986 OK 75, ¶ 5, 730 P.2d 510, 512.

burden of showing its infirmity by persuasive argument and analysis *cum* authority.[56] Fent has failed to pierce that presumption. The tendered issues and analysis, presented by text that covers only one-half of a page in the summary section of his brief, stand alone without any citation to Oklahoma jurisprudence or to that of other states with like or similar constitutional prohibition.[57] We need not consider challenges that are not rested on convincing argument firmly supported by legal authority.[58]

¶ 23 When the failure of advocacy occurs, its presence distorts the adversarial positions of the parties. There is here only a request for relief without supporting argumentation or legal authority material. This absence alters the nature of the appellate process by imposing upon the court the burden of researching and testing unsupported legal propositions sought to be pressed for victory. Appellate courts cannot be forced to become an active advocate for the party whose failure to brief or argue has produced a total intellectual vacuum for that party's asserted position.[59] To do so violates a basic common-law tenet that judges must always cast themselves into the role of neutral and detached decisionmakers rather than turning themselves into combatants in a forensic battle.[60]

¶ 24 Because Fent's constitutional arguments are undeveloped and unsupported by clear argument with authority, he has failed to demonstrate any infirmity in the acts of state executive officials by which appropriated funds were awarded to a private industry and to a municipal airport. We hence decline to reach and resolve these issues today.

## VIII

### RELIEF GRANTED

¶ 25 We hold that the CRB's mandatory participation in the grant approval process is

**56.** *Edmondson v. Pearce, supra* note 29, at ¶ 17, 91 P.3d at 615.

**57.** No reference to this argument is found in Fent's application to assume original jurisdiction or in the appendix he filed in this cause. We note that Edwin Kessler's (*supra* note 1) Petition for Declaratory Judgment challenges the funding for the Ardmore projects. His argument is unsupported by convincing argument and legal authority.

**58.** Claims to error for which there is no support in argument and authority are deemed abandoned. *Graham v. Keuchel,* 1993 OK 6, n. 3, 847 P.2d 342, 345; *Holbert v. Echeverria,* 1987 OK 99, 744 P.2d 960, 962; *Peters v. Golden Oil Co.,* 1979 OK 123, ¶ 3, 600 P.2d 330, 331. Where an assignment of error lacks any citation of authority, it need not be considered. *Read v. Read,* 2001 OK 87, ¶ 1, n. 1, 57 P.3d 561, 562; *S.W. v. Duncan,* 2001 OK 39, ¶ 31, 24 P.3d 846, 857; *Beets v. Metropolitan Life Ins. Co.,* 1999 OK 15, ¶ 9 n. 7, 995 P.2d 1071, 1073; *Mills v. Grotheer,* 1998 OK 33, ¶ 15, 957 P.2d 540, 544. *See* Okla. Sup.Ct. R. 1.11(k)(1), 12 O.S. Supp.2004, Ch. 15, App. 1, whose pertinent terms provide that "[a]rgument [in an appellate brief] without supporting authority will not be considered." *See in this connection Femedeer v. Haun,* 227 F.3d 1244, 1255 (10th Cir.2000) ("[P]erfunctory complaints [that] fail to frame and develop an issue [are not] sufficient to invoke appellate review." (citations omitted)); *Hershinow v. Bonamarte,* 735 F.2d 264, 266 (7th Cir.1984) (the court refused to consider an equal protection argument presented in a perfunctory and underdeveloped manner).

**59.** Neither counsel nor *pro se* litigants have a right to place upon this court the researching burden and consume its time in a search for authorities that would support their argument. *See* cases cited in *supra* note 58; *Peoria Corp. v. Lemay,* 1994 OK 106, 895 P.2d 1340 (*pro se* litigants are charged with the responsibility of complying with the rules of pleadings, evidence and appellate practice); *Funnell v. Jones,* 1985 OK 73, ¶ 4, 737 P.2d 105, 107.

**60.** *Marshall v. Jerrico, Inc.* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980); *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972). "The adversary system relies on a neutral and passive decision maker to adjudicate disputes after they have been aired by the adversaries in a contested proceeding." Stephan Landsman, Readings on Adversarial Justice: The American Approach to Adjudication 2 (1988). *See also Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) (the court dismissed a civil servant's due process challenge to a job reassignment because he had not adequately briefed whether his interest tendered a constitutionally protected property right). *See, e.g., Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988) ("The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful statements on both sides of the question.'") (quoting Irving R. Kaufman, *Does the Judge Have a Right to Qualified Counsel?,* 61 A.B.A. J. 569, 569 (1975)).

**tainted** by a constitutional infirmity that **invalidates** those provisions of 62 O.S.Supp. 2006 § 48, which require the CRB's approval of all expenditures from the Opportunity Fund.

¶ 26 Because Fent did not seek any *pendente lite* relief in order to prevent payments due in advance of the court's pronouncement from being made, we make today's opinion prospective only. It will apply with effect to post-pronouncement payments to the designated recipients of funds to be made under the Act.[61]

## IX

## THE KEY QUESTION'S MOOTNESS

¶ 27 Although the CRB's usurpation of power, interposed into the approval process, did not in this case interfere with the executive service's payout to the selected applicant, the fact of the board's tainted authority cannot be deemed to have been mooted as a legal issue to be resolved. It presents an important question of public law which is likely to recur at some point in the future when other appropriations to the Opportunity Fund are sought to be expended for the benefit of qualified recipients.[62]

## X

## SUMMARY

¶ 28 Fent has standing as a taxpayer to challenge the Legislature's usurpation of the executive branch's power over the expenditure of enacted appropriations to the Opportunity Fund.

¶ 29 This case is appropriate for the court's assumption of its original jurisdiction to grant declaratory relief. The present litigation tenders a matter of public interest and there is a pressing need for an early decision.

¶ 30 The Legislature cannot participate, either directly or through administrative boards having legislators as its members, in the administration of funds appropriated by enacted legislation. The CRB's participation in the approval process for expenditures from appropriated funds, as it is mandated by the terms of 62 O.S.Supp.2006 § 48, constitutes legislative usurpation of powers belonging to the executive branch. Those constitutionally infirm provisions of § 48 which relate to the CRB are severable and the remainder of the statute can stand alone as untainted by today's sentence of nullity.

¶ 31 Original cognizance is taken and declaratory relief granted.

¶ 32 EDMONDSON, V.C.J., LAVENDER, HARGRAVE, OPALA, WATT, TAYLOR and COLBERT, JJ., concur.

¶ 33 WINCHESTER, C.J., disqualified.

¶ 34 KAUGER, J., recused.

---

61. Judicial policy determines whether, and to what extent, a new rule will operate retroactively. *Globe Life and Acc. Ins. Co. v. Oklahoma Tax Com'n,* 1996 OK 39, 913 P.2d 1322, 1329; *Griggs v. State ex rel. Oklahoma Dept. of Transp.,* 1985 OK 51, 702 P.2d 1017, 1020. When an invalid statute calls for a compulsory discharge of statutory duties by public officials who rely on the presumptive validity of statutes, this court may give its pronouncement purely prospective effect. *Ethics Com'n. of State of Oklahoma v. Cullison, supra* note 35, at ¶ 30, 850 P.2d at 1079; *General Motors v. Oklahoma County Board of Equalization,* 1983 OK 59, 678 P.2d 233, 239–240 (Supplemental Opinion on Rehearing); *Oklahoma*

*Education Ass'n., Inc. v. Nigh,* 1982 OK 22, 642 P.2d 230, 239.

62. Mootness is a state or condition which prevents the appellate court from rendering effective relief. *Morton v. Adair County Excise Bd.,* 1989 OK 174, 780 P.2d 707, 711. Oklahoma jurisprudence recognizes but two "escape hatches" from its strictures—the public-interest and the likelihood-of-recurrence exceptions. *Lawrence v. Cleveland County Home Loan Auth.,* 1981 OK 28, 626 P.2d 314, 315–316; *In re D.B.W.,* 1980 OK 125, 616 P.2d 1149, 1151.