2015 OK CIV APP 53

**ALFALFA ELECTRIC COOPERATIVE, INC., Plaintiff/Appellee,**

v.

**MID–CONTINENT CASUALTY COMPANY, an Oklahoma for Profit Corporation, Defendant/Appellant,**

**and**

Superior Pipeline Company, L.L.C., an Oklahoma Limited Liability Company, and Triple J. Production, Inc., Defendants.

**No. 111,581.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Dec. 19, 2014.

Rehearing Denied Jan. 14, 2015.

Certiorari Denied May 11, 2015.

**1278**

Richard E. Hornbeek, Amber M. Brock, Larry George Cassil, Jr., Hornbeek, Vitali & Braun, P.L.L.C., Oklahoma City, Oklahoma, for Plaintiff/Appellee.

Thomas Edward Mullen, Oklahoma City, Oklahoma, for Defendant/Appellant.

Wm. C. HETHERINGTON, JR., Vice–Chief Judge.

¶1 In this action for breach of contract, negligence and *quantum meruit* Alfalfa Electric Cooperative, Inc. (AEC) filed against Superior Pipeline Company L.L.C. (Superior), Triple J Production Company, Inc. (Triple J), and Appellant Mid–Continent Casualty Company (Insurer) for damages to AEC's transformer and trailer, Insurer appeals a summary adjudication order in favor of AEC finding the commercial auto policy Insurer issued to Triple J provided coverage for the alleged damages sought by AEC. We **affirm**.

### STANDARD OF REVIEW

¶2 This appeal is governed by and follows the procedure set forth in Oklahoma Supreme Court Rule 1.36, 12 O.S.2011, ch. 15, app. 1, without appellate briefing. The appellate standard of review for a trial court's grant of summary judgment is *de novo*. *Carmichael v. Beller*, 1996 OK 48, ¶2, 914 P.2d 1051, 1053. When one party is entitled to judgment as a matter of law, *i.e.*, there are no material disputed facts, summary judgment will be affirmed. *Id.*

### HISTORY OF CASE

¶3 AEC's second amended petition generally alleged that in February 2010 AEC agreed to rent Superior a 5,000 KVA trailer mounted transformer on a temporary basis and Superior agreed to pay a rental fee and assume any and all liability for the transformer "from the time it was delivered and until it was picked up by [AEC]." AEC further alleged, as facts common to all "counts': 1) Superior did not pay any monies owed under the rental agreement, 2) when Superior had finished working with the transformer, it hired Triple J to return it to AEC, 3)

while Triple J was in route to AEC, a mishap occurred with the trailer hitch on Triple J's trailer, resulting in damage to the transformer, the transformer trailer, and a spill of the transformer's fluids "onto the ground," 4) the incident occurred in Enid, Oklahoma, 5) an undetermined amount of oil leaked onto the pavement, and a fire was started, and at all times pertinent, 6) Triple J was a licensed intrastate "private" motor carrier, and Insurer held the "liability insurance policy covering injuries and property damage as required by Oklahoma law."

¶ 4 AEC's second amended petition included the originally-pled two "counts" or theories of liability against Superior, *i.e.*, breach of contract and *quantum meruit*, and three against Triple J, *i.e.*, breach of bailment contract, negligence, "presumption of negligence/res ipsa loquitor." AEC added Insurer as a defendant and a new theory of liability against Triple J and Insurer, alleging they were jointly liable for the damages caused by Triple J based on the insurance policy issued "by [Insurer] pursuant to the applicable motor carrier regulations."

¶ 5 Insurer moved for summary judgment, arguing there was no coverage for the alleged damages due to certain exclusions in Triple J's three separate policies, *i.e.*, commercial auto liability, commercial general liability policy, and inland marine. To support its arguments, Insurer attached AEC's second amended petition, relevant pages of the three policies, and an affidavit from Insured's employee, Gary Renneckar, attesting Insurer had three policies with Triple J and that there was no coverage under the policies. AEC filed a combined response and cross-motion for summary judgment, attaching Triple J's answers to AEC's first request for admissions and its first interrogatories,[1] excerpts from Mr. Renneckar's deposition testimony, and a "certified" copy of Triple J's multi-page commercial auto liability policy.

¶ 6 Insurer filed a response opposing AEC's cross-motion and a separate reply to AEC's response to Insurer's summary adjudication motion. AEC then replied to Insurer's response to AEC's cross-motion. Three weeks later, the trial court filed a letter addressed to the parties' counsel which summarized its rulings on their motions, identified the remaining issues, and directed AEC's counsel to prepare the order.

¶ 7 Following the filing of both parties' motion to settle journal entry, the court filed a "Journal Entry of Judgment" October 3, 2012. The judgment states the parties' motions were taken under advisement pending receipt of "a certified copy of the Commercial Auto Liability Policy issued to [Triple J] by [Insurer] which [it] subsequently provided."[2] It also states the court "considered that Policy in rendering its decision" and "adopts and includes the Policy as part of the summary judgment evidence of rec-

---

1. Per Triple J's answers to AEC's request for admissions, Triple J admits it "entered into an agreement with Superior "to transport the transformer back to [AEC]." Triple J also admitted it was a "bailee" of the transformer during the time Triple J had possession of the transformer. Per AEC's first interrogatories, Triple J admits it "has transacted and done business with Superior numerous times in the past five years," did not enter into a written contract with [Superior] in regard to the transportation of the KVA trailer mounted transformer identified in [AEC's] petition," and that the "[v]ehicle used to transport the trailer mounted transformer ... [was a] 2000 FL 80 Freightliner." Triple J denied any use of the transformer while it was in its possession. According to Triple J, its employee, Justin Frye, spoke and agreed with Superior that Triple J would be hired to transport the transformer, and its licensed certified DOT driver Ronald Tharp was driving the covered vehicle to transport the transformer on March 3, 2010. "[Triple J] verily believes there may have been both (sic) a trailer brake malfunction resulting in excessive stress to the trailer hitch."

2. There is a page missing from the accelerated record, specifically "p. 10 of 12" in Exhibit 4, Triple J's commercial auto liability policy attached to AEC's cross-motion for summary judgment. The missing page presumably defines the policy term, "insured contract," upon which AEC relies to support the applicability of an exception to the policy's exclusion for contract damages. This missing page may explain the trial court's need to take the case under advisement pending receipt of a "certified copy" of the Policy. AEC quoted the definition of "insured contract" from the Policy in its cross-motion, the accuracy of which Insurer does not dispute in its response. Uncontroverted admissions in the brief are acceptable as material supplementing the record. *Deffenbaugh v. Hudson*, 1990 OK 37, ¶ 4, 791 P.2d 84, 85.

ord." After stating the parties were notified of its ruling by letter dated Aug. 22, 2013,[3] the court denied Insurer's motion for summary adjudication and granted, in part, AEC's cross-motion, without explanation for rulings. Six days later, Insurer moved for immediate appeal, which AEC opposed, and after a hearing, the trial court denied Insurer's certification request by order filed Jan. 30, 2013.

¶ 8 The trial court subsequently filed a "Journal Entry of Judgment" on February 14, 2013, explaining Triple J had confessed liability for the accident that is the subject of the lawsuit and damages to AEC's property and equipment. The court also explains his prior decisions to overrule Insurer's motion to dismiss based on his determination it was a proper party in the case and to grant summary adjudication in favor of AEC and against Insurer. In the same judgment, the court finds 1) AEC was entitled to judgment against Triple J and Insurer, jointly and severally, 2) there was no dispute as to amount of damages, which totaled $54,712.06, 3) the parties agreed to AEC's entitlement to attorney fees as the prevailing party in its negligent injury to property action pursuant to 12 O.S.2011 § 940, and to the amount of reasonable fees and costs AEC incurred in prosecuting the action, in the sum of $27,012.09. That same day, AEC filed a dismissal of any and all of its claims against the remaining party, Superior, without prejudice to refiling. Insurer's appeal followed.

## ANALYSIS

¶ 9 Insurer's Petition in Error raises four errors with the trial court's granting of AEC's cross-motion for summary judgment. Based, in part, on AEC's dismissal of its claims against Superior, we need not address Insurer's allegation of error concerning inclusion of damages for rent in the award.[4] Concerning the remaining three issues, Insurer basically argues the evidentiary materials and the unambiguous language in Triple J's commercial auto liability (CAL) policy reveal disputed material facts relating to three separate policy exclusions applicable to AEC's damages which Insurer argues preclude summary adjudication in AEC's favor.

¶ 10 As previously noted, the summary adjudication order on appeal does not specify any reason(s) for denying Insurer's motion or granting, in part, AEC's cross motion for summary judgment. In light of the parties' arguments, the order on appeal implies the trial court's agreement that the Policy's exclusions are unambiguous, the material facts necessary to apply each of the three policy exclusions are undisputed, and as a matter of law, neither exclusion applies in this case to exclude coverage.

---

3. In its August 22, 2012 letter included in the accelerated record, the trial court found Insurer's "Commercial Auto Policy" covers Triple J for specified damages because:

   > As AEC's bailee, Triple J is responsible for the damages to AEC's property that occurred while in the control of Triple J. Because of this bailment, [Insurer's] Policy exclusion of "insured contract" is inapplicable as a carve out of the contracts exclusion.
   >
   > Further, the pollution exclusion is inapplicable, as a governmental entity ordered the clean up. While the bill was sent to AEC, Triple J was the cause of the bill. [Insurer's] Policy covers the environmental spill cleanup and testing.

   We do not rely on the above ruling due to several inconsistencies. First, the trial court does not expressly rule out Exclusion B.6. although argued by Insurer. However, the court's coverage finding partly based on Triple J's "control" of AEC's property when the damage occurred, alone, triggers that exclusion and therefore appears inconsistent with both denial of Insurer's motion and granting of AEC's cross-motion. Further, even if we assume by the trial court's reference to "Policy *exclusion* of 'insured contract'" that he instead meant to say, "Policy *exception* of 'insured contract,'" his finding that the latter is *"inapplicable* as a carve out of the contracts exclusion" is basically a finding that Exclusion B.2. excludes coverage. This too would be inconsistent with his denial of Insurer's motion and granting of AEC's cross-motion.

4. In one of the four issues listed in Exhibit C of Insurer's Petition in error, it contends there are "fact issues" regarding "the allegation that part of the damages were rent when rent is not the type of damages covered by [Insurer's] Commercial Auto Policy." Those alleged damages were requested by AEC in its claim solely against Superior "for unpaid monies owed under the contract for rent of the transformer and use of the trailer between AEC and Superior." The issue appears to be moot due to AEC's dismissal "any and all of [its] claims against [Superior]" in the case "without prejudice to future refiling of the same" on February 14, 2013.

¶ 11 Insurer does not, however, raise any error on appeal with the court's implied rejection of Insurer's "standing" arguments made in response to AEC's cross-motion for summary judgment: 1) AEC lacks "standing" to bring a direct action against Insurer because AEC's alleged damages are to "cargo," for which 47 O.S.2001 § 230.30(B) requires the filing of a "cargo" insurance policy or bond and Insurer issued Triple J only a policy covering public liability and property damage required by 47 O.S.2001 § 230.30(A), and 2) motor carrier liability insurers are *not proper parties* in tort actions filed against their insureds and can be sued directly only after judgment has been entered against the motor carrier, citing *Fierro v. Lincoln General Insurance Company*, 2009 OK CIV APP 62, 217 P.3d 158.

¶ 12 In AEC's reply, it argues Insurer had made the "same argument" in its motion to dismiss and that the trial court correctly denied "based on long-standing Oklahoma judicial authority." Neither Insurer's motion to dismiss or the order resolving it is included in the accelerated record. However, the trial court's denial has record support in the October 3, 2013 Journal Entry of Judgment, explaining he overruled the dismissal motion, finding Insurer "is a proper party in this case."

¶ 13 "Standing refers to a person's legal right to seek relief in a judicial forum." *Fent v. Contingency Review Bd.*, 2007 OK 27, ¶ 7, 163 P.3d 512, 519. "Standing may be raised at any stage of the proceeding, and when raised, the party invoking the court's jurisdiction has the burden of establishing his or her standing." *Wells Fargo Bank N.A. v. Heath*, 2012 OK 54, ¶ 12, 280 P.3d 328, 334.

¶ 14 To the extent Insurer's second argument re-urges AEC may not bring a direct action against Insurer as Triple J's motor carrier liability insurance carrier *and* its first argument brings a new challenge to AEC's standing based on Insurer's alleged non-liability for AEC's alleged damages to "cargo," we must address these predicate issues before proceeding with interpretation of the policy. We begin with Insurer's second argument.

¶ 15 As relevant here, Insurer issued a Form F to Triple J pursuant to § 230.30(A), part of Oklahoma's Motor Carrier Act of 1995 (the MCA), 47 O.S. § 230.21 *et seq.* According to § 230.22(C), the MCA applies "to the transportation of passengers or property by *motor carriers and private carriers*, except motor carriers of household goods and used emigrant movables, over public highways of this state." (Emphasis added.) Section 230.30(A) mandates "no license shall be issued by the [Corporation] Commission to any carrier until after the carrier shall have filed with the Commission a liability insurance policy or bond covering public liability and property damage ..."

¶ 16 That section's predecessor, 47 O.S. 2001 § 169, has long been interpreted by the Supreme Court 1) to make a motor carrier and its insurer "jointly liable" and 2) to allow an injured third party to bring a direct action against a tortfeasor motor carrier and its insurer when the liability policy or bond required by § 169 has been filed with the Oklahoma Corporation Commission (OCC). *Daigle v. Hamilton*, 1989 OK 137, ¶ 8, 782 P.2d 1379, 1381 (citing *Enders v. Longmire*, 1937 OK 154, 67 P.2d 12). Important to this issue, the Legislature enacted § 230.30(A) as part of the MCA without deleting any § 169 language the Supreme Court had previously interpreted to allow a direct action against a motor carrier and its insurer, *i.e.*, "the liability and property damage insurance policy or bond *shall bind the obligor thereunder to make compensation for ... loss or damage to property*, resulting from the *operation* of any carrier for which the carrier is legally liable."

¶ 17 In *Fierro*, another panel of this division of the Court of Civil Appeals addressed § 230.30(A) of the MCA and found the statute denied a third party's direct action against the insurer of an *interstate* motor carrier whose compulsory public liability policy had been filed in its home state and not in Oklahoma as required to invoke the MCA. Thus *Fierro* is factually distinguishable from the instant case which involves an *intrastate* motor carrier, Triple J, about which there is no dispute its § 230.30(A) liability policy was properly filed with the OCC.

¶ 18 Insurer also argues § 230.30(A)'s language, *i.e.*, "after judgment against the carrier for any damage, the injured party may maintain an action upon the policy or bond to recover the same, and shall be a proper party to maintain such action," precludes a direct action against a motor carrier insurer *until entry of judgment* against the motor carrier. However, the same argument regarding this exact language in § 169 was made in *Enders v. Longmire* and expressly rejected by the Supreme Court, 1937 OK 154, ¶ 14–15, 67 P.2d at 15. More importantly, in 1995, the Legislature adopted the same § 169 language when it enacted § 230.30(A) of the MCA. "Unless a contrary intent appears, if a statute previously construed by a court of last resort is reenacted in the same or substantially the same terms, the Legislature is presumed to have been familiar with the previous construction and to have adopted such construction as an integral part of the statute." *Boswell v. Schultz*, 2007 OK 94, ¶ 13, 175 P.3d 390, 394. Finding no contrary intent in § 230.30(A), we affirm the trial court's implied rejection of Insurer's general standing argument.

¶ 19 We also reject Insurer's lack of standing argument based on its position that AEC's alleged damages to its transformer are to "cargo," for which § 230.30(B) mandates "cargo" insurance. The Legislature enacted the MCA to "regulate transportation by motor carriers and private carriers" for the "public interest," recognizing the need to require "all motor carriers and private carriers" 1) to have adequate insurance, 2) to provide service in a safe and efficient manner, and 3) to prevent "a detrimental impact on the environment" by the operations of "motor carriers and private carriers." *See* § 230.22(A) of the MCA.

¶ 20 As relevant here, the Legislature vested the OCC with powers "to protect the *shipping* and *general public* by supervising and requiring insurance of all motor carriers and private carriers" and "to establish there will be no detrimental environmental impact." § 230.24(A)(2) and § 230.24(A)(4) of

the MCA. The OCC also has the duty "to supervise and regulate motor carriers in all other matters affecting the relationship between such carriers and the *traveling and shipping public.*" § 230.24(A)(5) of the MCA. As part of the general and shipping public, AEC qualifies as an intended beneficiary of the MCA's protections. See also *Casualty Reciprocal Exchange v. Waggoner Drilling Company*, 1959 OK 43, 340 P.2d 490 (based on § 169 and motor carrier's liability policy, the court held the insurer liable to a non-traveling owner for property damages to a drilling rig during re-assembly).

¶ 21 The terms "motor carrier" and "private carrier" are defined by the MCA with very distinct meanings. As relevant here, a "motor carrier" means "any person ... operating upon any public highway for the transportation of passengers or property for compensation or for hire or for commercial purposes, and not operating exclusively within the limits of an incorporated city or two with this state." § 230.23(6) of the MCA. In contrast, "private carrier" means "any person engaged in transportation upon public highways, of persons or property or both, *but not as a motor carrier.*" (Italics added.) § 230.23(9) of the MCA. "Private carrier" also "includes any persons who transports property by motor vehicle where such transportation is incidental to or in furtherance of any commercial enterprise of such person, *other than transportation.*" *Id.*

¶ 22 Unlike the majority of the MCA sections which address "motor carriers and private carriers,"[5] Insurer's argument fails to consider § 230.30(A)'s mandate for filing a liability policy with the OCC, is directed to "any carrier," which reference clearly and unambiguously includes both motor carriers and private carriers. In contrast, § 230.30(B) of the MCA mandates "every *motor carrier*" to file a cargo insurance policy covering any goods or property being transported. Similarly, the MCA also mandates "every *motor carrier,* subject to the [MCA], receiving property for transportation

---

5. See § 230.22 and § 230.24(A)(1–4). However, the MCA refers only to "motor carriers" in § 230.25(A) ("every motor carrier ... receiving property for transportation in intrastate com-

merce shall issue a receipt or bill of lading therefor ...."). Section 230.28(A) separately identifies unlawful conduct in Oklahoma for "any motor carrier" and for "any private carrier."

in intrastate commerce" to issue a receipt or bill of lading." § 230.25 of the MCA. The MCA includes no similar or identical statutory mandates for "private carriers." Based on our interpretation of § 230.30, in its entirety and with the MCA as a whole, and in light of its stated intent and purposes, we conclude the Legislature clearly intended both motor carriers and private carriers to file § 230.30(A) liability insurance policies, whereas the § 230.30(B)'s mandate for cargo insurance only applies to motor carriers.

¶ 23 In this case, except for the sole reference in the title of the Form F attached to the Policy, "Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement," Insurer has not demonstrated Triple J is a "motor carrier," as defined by the MCA, to which § 230.30(B)'s requirement for a cargo insurance applies. Because the evidentiary materials presented to the trial court support only Triple J's status as a intrastate private carrier, we affirm the trial court's implied rejection of Insurer's remaining standing argument.

### Rules Applicable to Insurance Policies

¶ 24 "Interpretation of a policy with its exclusions is a law question," *unless* the facts necessary to apply the decided law question are in dispute. *Wiley v. Travelers Insurance Company,* 1974 OK 147, ¶ 15, 534 P.2d 1293, 1296. "A policy of insurance is a contract and should be construed like any other contract ... where not ambiguous, according to its terms." *Id.,* ¶ 16. "Parties to insurance contracts are at liberty to contract for insurance to cover the risks as they see fit and are bound by terms of the contract." *Id.* As a result, "courts will not undertake to rewrite terms [of the insurance contract]." *Id.*

¶ 25 In a dispute over the language of an insurance policy, our first step is to determine as a matter of law whether the policy language at issue is ambiguous. *See Wynn v. Avemco Ins. Co.,* 1998 OK 75, ¶ 17, 963 P.2d 572, 575. If it is not ambiguous, we accept the language in its plain, ordinary and popular sense. *McDonald v. Schreiner,* 2001 OK 58, ¶ 7, 28 P.3d 574, 577. "We construe the policy to give a reasonable effect to all of its provisions." *Cranfill v. Aetna Life Ins. Co.,* 2002 OK 26, ¶ 5, 49 P.3d 703, 706.

¶ 26 We are also mindful that the "general declaration of insurance ... normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the policy." *Dodson v. St. Paul Ins. Co.,* 1991 OK 24, ¶ 13, 812 P.2d 372, 377 (footnote omitted). "[A]n exclusion ... eliminates coverage where, were it not for the exclusion, coverage would have existed" under the insurance policy. *Id.,* at n. 11. "Policy exclusions are read seriatim; *each exclusion* eliminates coverage and operates independently against the general declaration of insurance coverage and all prior exclusions by specifying other occurrences not covered by the policy." *Id.,* ¶ 13, 812 P.2d at 377 (footnote omitted). "In case of doubt, exclusions exempting certain specified risks are construed strictly against the insurer." *Id.* (footnote omitted). With these rules in mind, we review the Policy.

### The Policy

¶ 27 As relevant here, Triple J is the named insured listed on the Policy's Declaration Page, which describes Triple J as a "corporation" that "installs & repairs oilfield production equipment." The Policy and its endorsements provides coverage for, *inter alia,* liability, uninsured motorists, and motor carrier bodily injury and property damage liability.

¶ 28 Pursuant to "Section II—Liability Coverage" and subsection A of the "Business Auto Coverage," Insurer agreed to pay: 1) "all sums an 'insured' legally must pay as damages because of ... property damage" and 2) "all sums an "insured" legally must pay as a "covered pollution cost or expense," that "are caused by an accident and resulting from the ownership, maintenance or use" of covered autos.

¶ 29 "Property damage" is defined by the Policy as "damage to or loss of use of tangible property," about which there is no dispute the damages to AEC's transformer and trailer qualify as such damages were caused by an "accident" and resulted from the use of

one of Triple J's covered autos. The Policy also defines "covered pollution cost or expense" as: 1) "any request, demand . . . that any 'insured' or others . . . clean up, remove, contain . . . or neutralize . . . the effects of pollutants,"; or 2) "[a]ny claim or suit by or on behalf of a governmental entity for damages because of. . . . cleaning up, removing . . . or neutralizing . . . the effects of pollutants." There is no dispute in this case that: 1) there were billed costs or expenses associated with the cleanup for the "spill of fluids from the transformer onto the ground" and/or "the oil that leaked onto the pavement" or 2) the "fluids" and/or "oil" are "pollutants," as that term is defined by the Policy.

¶ 30 The controversy between AEC and Insurer involves the applicability of the following three exclusions of the Policy's "Business Auto Coverage" section:

B. Exclusions

This insurance does not apply to any of the following:

\* \* \*

2. Contractual

*Liability imposed under any contract or agreement.*

But this exclusion *does not apply to liability for damages:*

a. *Assumed in a contract or agreement that is an "insured contract"* provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

b. *That the "insured" would have in the absence of the contract or agreement.*

\* \* \*

6. Care, custody or Control

*"Property damage"* or *"covered pollution cost or expense"* involving *property* owned or *transported by the "insured" or in the "insured's" care, custody or control.* But this exclusion does not apply to liability assumed under a sidetrack agreement.

\* \* \*

11. Pollution

"Bodily injury" or *"property damage" arising out of the actual,* alleged or threatened discharge, dispersal, seepage, migration, *release or escape of "pollutants":*

a. That are, or *that are contained in any property that is:* [6]

(1) *Being transported or towed by . . . the covered auto.*

(2) *Otherwise in the course of transit by or on behalf of the "insured";* or . . . [7] (Italics added.)

*Exclusions B.6. and B.11*

¶ 31 To support the Policy provides no liability coverage for AEC's damages, Insurer essentially argues there is one undisputed material fact in common to Exclusions B.6. and B.11. that precludes summary judgment in favor of AEC and requires summary judgment in its favor—Triple J was transporting and towing AEC's trailer mounted transformer when it became unattached from Triple J's hitch.

¶ 32 AEC admits it originally alleged Triple J was "transporting" the trailer mounted transformer when it was damaged, but responds to Insurer's motion, arguing subsequent discovery revealed different circum-

---

6. Under the B.11. exclusion, the policy further states that "[p]aragraph a. above does not apply to fuels, lubricants, fluids . . . that are needed for . . . normal electrical, hydraulic or mechanical functioning of the covered auto or its parts." This language is clearly inapplicable to the facts of this case.

7. Paragraph a(3) of the B.11. exclusion, which excludes pollutants "being stored, disposed of, treated or processed in or upon the covered auto," has no application to the facts of this case. Because the subject accident undisputedly occurred on the highway and not at Triple J's place of business, we need not consider the remaining two paragraphs included in the B.11. exclusion

based on the following explanation within the exclusion:

Paragraphs b. and c. above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) . . . any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge . . . release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

stances leading to the incident about which "there is a question of fact ... precluding summary judgment." In its cross-motion, AEC argues the inapplicability of the pollution exclusion B.11. in great detail but does not make any similar argument about Exclusion B.6.

¶ 33 We agree there is a common thread in the Policy's Exclusions B.6. and B.11. by which Insurer attempts to exclude payment for both "property damage involving property ... *transported* by "insured" and "property damages ... arising from the actual ... release or escape of 'pollutants'... that are contained in any property that is being *towed or transported* by a covered auto." Relying solely on Gary Renneckar's deposition testimony, AEC argues the transformer and trailer were *no longer being towed or transported when the hitch malfunctioned.* Assuming without deciding that AEC's argument is correct, AEC has failed to consider an undisputed material fact revealed by the evidentiary materials, *i.e.*, Triple J was in physical possession or in custody of the transformer and trailer when the accident occurred. Application of that fact alone to the remaining part of Exclusion B.6., "property damage involving property ... in the insured's care, custody or control", results in potential application of that specific exclusion.

¶ 34 Similarly, it is also undisputed Triple J was between its point of departure and the final destination 1) when the hitch on its covered vehicle malfunctioned and ultimately causing the transformer and trailer to overturn and 2) when the pollutants contained in the transformer were released on the ground and/or pavement. As a result, application of these undisputed facts to the remaining part of Exclusion B.11.a.2., *i.e.*, " 'property damage' arising out of the actual ... release or escape of 'pollutants' ... that are contained in any property that is ... [o]therwise in the course of transit by or on behalf of the 'insured,' " also implicates this exclusion.

¶ 35 In light of these undisputed facts, the clear and unambiguous language of the Policy's Exclusion B.6. and B.11 would appear to support Insurer's position of no coverage under either exclusion and summary judgment in its favor. However, because the Policy, as AEC further argues,[8] includes a specific endorsement for motor carrier public liability insurance (Form F) required by § 230.30, we must address its effect on the Policy's coverages and exclusions.

¶ 36 We conclude the trial court's order in favor of AEC is supported by Oklahoma precedent interpreting § 230.30's predecessor, § 169, as becoming part of the Policy and controlling over similar policy exclusions. In *Casualty Reciprocal Exchange v. Waggoner Drilling Company*, 1959 OK 43, 340 P.2d 490, the owner of property sued a trucking company hired to transport an oil well drilling rig from one lease to another, seeking damages sustained to the drilling rig's mast while the trucking company was reassembling the rig at the delivery point. Similar to the facts of this case, a malfunction of the trucking company's vehicle caused the mast to fall to the ground when attempting to raise it with a winch that was attached to the truck.

¶ 37 Based on the undisputed evidence, the Court in *Waggoner* determined, as relevant here, that 1) the disassembling, loading, unloading, and reassembling of the oil rig and transportation from one lease to another "constituted *one continuous act of transportation* " and 2) even though the vehicle was off the highway at the time of the resulting damage, the *operation or use* of the vehicle in reassembling the rig was "incident to the *transportation* of the rig" and "had a proximate and necessary connection with the *operation and use* of the vehicle upon the highway within the meaning of 47 O.S. [1951] § 161–169."

¶ 38 The insurer in *Waggoner*, similar to Insurer in this case, argued the trucking company's insurance policy did not cover the

---

8. On page 7 of AEC's Response and cross-motion, it lists the undisputed facts regarding Insurer's issuance of the motor carrier liability policy to Triple J as a private carrier. However, page 17 of that same brief is missing from the accelerated record submitted to this Court. Because

the next page contains AEC's argument for applicability of 47 O.S.2001 § 230.30(A) in the commercial auto policy Insurer issued to Triple J and Insurer replies solely to that argument, this Court has not required Appellant to provide the missing page.

risk. The Court in *Waggoner* pointed out that Insured had agreed in the policy filed with the OCC and covering the trucking company as a "Class B Motor Carrier,[9]"

> to pay on behalf of insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the loss of use thereof, and caused by accident arising out of the ownership, maintenance or use of any motor vehicle in the insured's business."

Considering the exclusion on which the insurer relied to argue the accident and resulting property damages were not covered by that policy, *i.e.,* "damage to or destruction of *loss of cargo or property in the possession of the Insured or for which the Insured is legally responsible as carrier ... or bailee ...,*" the *Waggoner* Court rejected the insurer's argument, finding;

> Under [47 O.S.1951 § ] 169, policies such as the one under consideration shall cover 'loss or damage to property.' This broad statutory provision, of course, becomes a part of the insurance policy in controversy and *prevails over provisions of the policy to the contrary. Enders v. Longmire,* [1937 OK 154], 67 P.2d 12." (Italics added.)

¶ 39 Relying on the *Waggoner* Court's same quote from *Enders,* the Court of Civil Appeals in *Western Casualty & Surety Co. v. J.R. Adams, Inc.,* 1970 OK CIV APP 4, ¶ 14, 465 P.2d 794, 796, reached the same conclusion regarding the insurer's liability to cover property damages to construction equipment and trailer for which its owner had hired the insured motor carrier to transport. While "pulling" the equipment and trailer, the insured motor carrier in *Western Casualty* negligently drove the owner's equipment and trailer into a highway overpass causing severe damages to the equipment. Like *Waggoner,* the insurer had issued a § 169 liability policy to a Class B motor carrier and argued its policy's terms excluded coverage to "injury to or destruction of * * *(3)* * *property *in the care, custody, or control of the insured* or property *as to which the insured for any purpose is exercising physical control.*" (Emphasis added.) The insurer also attempted to argue, as a bar to liability, language in the policy's motor carrier endorsement, "It is agreed and understood that the words 'Damages to Property' as used in this endorsement shall be construed to cover any and all property, *except property* of such insured, or carried in or on the motor vehicle belonging to *or controlled by the insured.*" (Emphasis added.) The Court in *Western Casualty* affirmed the trial court's judgment in favor of the plaintiff/property owner, finding "the policy of insurance having been filed pursuant to the statute, 47 O.S.1961, [§ ] 169, as then in force, the statute becomes a part of the contract of coverage and the terms of the statute control as to the character of said coverage." Although differently phrased, the policy exclusions in *Waggoner* and *Western Casualty* each attempted to eliminate liability coverage for property in the *possession* or *control* and damaged during operation of a motor carrier's business, the very circumstances for which [§ ] 169 mandated such coverage.

¶ 40 Similar to the pre–1995 and 1995 versions of § 169, § 230.30(A) of the MCA mandates "no license shall be issued by the [Oklahoma Corporation] Commission to any carrier until after the carrier shall have filed with the Commission a liability insurance policy or bond covering public liability and property damage ..." Identical to the language in § 169 relied on by the Court in

9. Pursuant to 47 O.S.1951 § 161(b)(1), "Class 'A' motor carriers" included "all motor carriers operating as common carriers, of persons or property between fixed termini or over a regular route, even though there be periodic or irregular departures from said termini or route." Under § 161(b)(2), "Class 'B' motor carriers shall include all other motor carriers not operating as Class "A" or "C" motor carriers, whether as private carriers for hire or common carriers for hire, of persons or property." Section 161(b)(3) defined "Class 'C' motor carriers" as including all other persons, firms, or corporations, their trustees or receivers, engaged in the transportation of property in furtherance of any private commercial enterprise and not operating as a private carrier for hire or as a common carrier for hire." It appears from these definitions that a "private carrier," as currently defined by § 230.22(9) of the MCA, is a combination of B and C motor carrier classes.

*Waggoner,* § 230.30(A) mandates "the liability and property damage insurance policy or bond *shall bind the obligor thereunder to make compensation for ... loss or damage to property,* resulting from the *operation* of any carrier for which the carrier is legally liable."

¶41 Further, pursuant to the Form F motor carrier liability endorsement in this case, Insurer and Triple J agreed that "the certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law ... *amends the policy* to provide insurance for automobile bodily injury *and property damage liability in accordance with the provisions of such law ... to the extent of the coverage* and limits of liability required thereby." (Emphasis added.)

¶42 Like the owner of the damaged drilling rig in *Waggoner* and the owner of damaged construction equipment in *Western Casualty,* each of whom sued the respective tortfeasor motor carrier for only property damages, AEC was not involved in the specific accident with Triple J during which AEC's transformer and trailer were damaged while being transported by Triple J, who was undisputedly operating as a motor carrier at the time. Therefore, *Waggoner* clearly supports long standing Oklahoma precedent holding motor carrier liability insurance required by § 169 was intended to protect "the shipping and general public," not only the traveling public. 47 O.S.2001 § 162; *see also Tri–State Insurance Company v. J.O. Hobbs,* 1959 OK 243, ¶ 0, 347 P.2d 226, 227; *Utilities Ins. Co. v. Potter,* 1940 OK 127, 105 P.2d 259, cert. dismissed 312 U.S. 662, 61 S.Ct. 804, 85 L.Ed. 1109.

¶43 Further, the regulations mandated for motor carriers and private carriers by the MCA indicate the Legislature's clear intent for the same protections as that intended by § 169. *See* 47 O.S.2001 § 230.22 ("it is necessary in the 'public interest' to regulate transportation by motor carriers and privates carriers ... [and] to recognize the need of [both carriers] to have adequate insurance ... [and] to provide service in a safe and efficient manner.) Our interpretation is also supported by the similarities in the authority vested in the OCC to enforce these statutes. *See* 47 O.S.2001 § 162 and 47 O.S.2001 § 230.24.

¶44 Finally, although no exclusion similar to Exclusion B.11. "Pollutants" was at issue in either *Waggoner* or *Western Casualty,* we find further support for applying *Waggoner* to that exclusion based on the Legislature's since-added protection to the MCA, *i.e.,* "to establish that operations of [both carriers] will not have a detrimental impact on the environment." This language clearly and unambiguously provides for joint liability of motor carriers and their insurers, as in this case, for damages to the environment arising from the transportation of pollutants or property containing pollutants.

¶45 Because Exclusions B.6. and B.11. each similarly attempt to eliminate coverage contrary to § 230.30(A), we conclude, based on *Waggoner* and the intent and stated purposes for the MCA, that the Policy's Form F became part of the Policy and controls over these two exclusions. *Albeit* for other grounds, we affirm the court's summary adjudication in favor of AEC based on Exclusions B.6. and B.11.

### Contractual Exclusion

¶46 Insurer argues Exclusion B.2., "[l]iability imposed under any contract or agreement," provides no coverage "for damages as a result of a contractual obligation. By cross-motion, AEC argues the same exclusion does not apply, claiming the *bailment* between Superior and Triple J is an "insured contract" [10] which is the first exception to Exclusion B.2. We agree Exclusion B.2. does not apply.

10. As used in Exclusion B.2., the Policy defines the term "insured contract" as follows:

That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

¶ 47 Insurer's arguments in its summary judgment and its response to AEC's cross motion relies on 1) Triple J's admission it had an agreement with Superior *to transport* the trailer mounted transformer, and 2) AEC's alleged failure to present any evidence of its speculation of a "master servant agreement" or other contract between Triple J and Superior that would constitute an "insured contract." For application of Exclusion B.2.'s insured contract exception, AEC contends it has proven beyond dispute the status between Superior and Triple J as bailor-bailee for which Oklahoma bailment statutes makes the latter liable to AEC for damages to the bailed property. The trial court agreed with AEC.

¶ 48 Insurer cites no supporting authority for its interpretation of Exclusion B.2. This Court's research discovered no published state or federal court cases interpreting the identical Exclusion B.2. language, "[l]iability *imposed* under any contract or agreement" in any type liability policy. Our research did disclose other types of contract exclusions with Exclusion B.2.'s same and/or similar exceptions. The most similar contract exclusion to the exclusion at issue is "[l]iability *assumed* under any contract or agreement," or words to that effect, which version has most commonly been interpreted in the context of commercial general liability insurance (CGLI) policies. In such policies, the Texas Supreme Court found a split of authority on its interpretation in *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 129–133 (2010), with several courts applying the exclusion only to contracts in which the insured has assumed another's liability, *e.g.*, indemnity or hold-harmless agreements, and other courts, including the Texas Supreme Court, interpreting the exclusion without any such limitation, *i.e.*, no coverage for a contract-based claim.

¶ 49 In 1991, the Oklahoma Supreme Court in *Dodson v. St. Paul Ins. Co.*, 1991 OK 24, ¶ 5, 812 P.2d 372, 374, interpreted an exclusion in a CGLI policy almost identical to the version addressed by the Texas Supreme Court, *i.e.*, "liability *assumed* by the Insured under contract or agreement except an incidental contract." and essentially reached the same conclusion.[11] The *Dodson* Court found "no ambiguity" with the exclusion, either when read alone or with two other exclusions not at issue in this case, and that it "removes from coverage *any cause of action grounded upon a liability* arising 'under contract or agreement except an incidental contract'." (Emphasis added.)

¶ 50 The Policy does not define the term "imposed" as used in Exclusion B.2. As a verb, its common definition is "to cause or to be burdened ... to force one to submit ... [or] to establish or create (something unwanted) in a forceful way." Webster's Third International Dictionary, p. 1136. Based on *Dodson* and the plain and unambiguous terms of Exclusion B.2. in this case, we conclude it "removes from coverage any cause of action grounded on a liability arising under contract or agreement," *i.e.*, contract-based claims. We further find that Exclusion B.2. applies here *unless* one of its two exceptions "reserves coverage," *see Dodson*, 1991 OK 24, ¶ 14, 812 P.2d 372, or "brings a claim back into coverage," *see Gilbert Texas Construction*, 327 S.W.3d at 133.

¶ 51 In this case, the contract upon which Insurer solely relies to invoke Exclusion B.2. to deny coverage to Triple J is the "bailment agreement" with Superior to return the transformer and trailer back to AEC. It is undisputed there was no written bailment agreement between those two parties whose terms would control over one implied by law. *Chambers v. Morgan*, 1983 OK CIV APP 59, ¶ 6, 671 P.2d 89 (citing *Oklahoma Petroleum & Gasoline Co. v. Winship*, 1921 OK 293, 83 Okla. 146, 200 P. 844).

¶ 52 AEC relies on the same bailment agreement to invoke the first exception of Exclusion B.2., which exclusion the Policy expressly states "does not apply to liability for damages ... a. [a]ssumed in a contract or

---

11. For the record, the contractual exclusion interpreted by the *Dodson* Court is very similar to the same exclusion in the CGLI Policy Insurer issued to Triple J and which Insurer also argued excluded coverage for the subject property damage to AEC's transformer and trailer, *i.e.*, "[t]his insurance does not apply to ... "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."

agreement that is an 'insured contract' ..." We can not agree with AEC's interpretation considering the Policy's definition of "insured contract" begins with "[t]hat part of any other contract or agreement pertaining to your business ... under which you assume the tort liability of another party to pay for ... 'property damage.' " As we interpret Exception a., in its entirety and with Exclusion B.2. as a whole, in order to qualify as an "insured contract," Triple J would have had to 1) expressly assume the tort liability of Superior to pay property damages to AEC under their rental contract *when* Triple J and Superior agreed to the bailment for the transformer and to 2) execute its agreement to assume Superior's tort liability *prior* to the property damage occurrence.

¶ 53 In this case, Insurer denied AEC's allegation in its second amended petition that Superior "agreed to ... assume any and all liability for the transformer" in its rental contract with AEC, and neither the rental contract nor other evidentiary support for Superior's alleged assumption is included in the accelerated record. Further, AEC has not produced any evidentiary support for the existence of a master service agreement or other contract between Triple J and Superior which AEC contends might also qualify as an "insured contract." As cross-movant for summary adjudication on the issue of Insurer's liability under the Policy, AEC has failed to establish application of exception a. to Exclusion B.2.

¶ 54 However, the same may not be said about Exception b. to Exclusion B.2. As previously noted, Exclusion B.2. does not apply to "liability for damages ... b. That the 'insured' would have *in the absence of the contract or agreement.*" Aside from the implied bailment agreement, Triple J would be liable for the property damages to AEC's transformer by general common law negligence and under Oklahoma's Motor Carrier regulations by virtue of the Form F attached to the Policy. Therefore, Exclusion B.2. is inapplicable due to reservation of coverage by Exception b. Having previously concluded the motor carrier liability endorsement issued to Triple J as required by § 230.30 controls over and replaces Exclusions B.6. and B.11., we find Insurer liable under the Policy.

## CONCLUSION

¶ 55 The trial court's summary adjudication in favor of AEC is **AFFIRMED.**

JOPLIN, P.J., and BUETTNER, J., concur.